ESTATE OF STIRTON OMAN, FIRST AMERICAN NATIONAL BANK, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Oman v. Commissioner
Docket No. 3014-81.
United States Tax Court
T.C. Memo 1987-71; 1987 Tax Ct. Memo LEXIS 67; 53 T.C.M. (CCH) 52; T.C.M. (RIA) 87071; February 9, 1987. William Waller, for the petitioner. Vallie C. Brooks, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's estate tax in the amount of $3,642,528.60. The issues for decision are: (1) what was the fair market value *68 on March 18, 1977, decedent's date of death, of decedent's 75.6 percent ownership, represented by 214,290 shares of common stock, of Oman Construction Co. (Oman Co.); and (2) whether an agreement reached between petitioner and respondent's Appeals Office, that decedent's stock in Oman Co. had a value of $49 a share at the date of decedent's death, is binding on respondent where petitioner withdrew the previously signed settlement document before its review and execution on behalf of respondent by a representative of the Office of District Counsel in order to claim additional deductions, and was thereafter advised by the Appeals Office that the value of the stock agreed upon was not acceptable. FINDINGS OF FACTS Some of the facts have been stipulated and are found accordingly. First American National Bank is the executor of the estate of Stirton Oman (petitioner). Upon the death of Stirton Oman (decedent) on March 18, 1977, First American National Bank qualified as the executor of decedent's last will and testament under the laws of the State of Tennessee. On the date the petition was filed, the bank had its principal place of business in Nashville, Tennessee. As executor of *69 decedent's estate, the bank filed on behalf of the estate a United States estate tax return with the Director of the Internal Revenue Service Center at Memphis, Tennessee, on December 21, 1977. On decedent's estate tax return, petitioner reported the fair market value of decedent's 214,290 shares of common stock in Oman Co. as $7,500,150 or $35 per share. On the date of decedent's death, Oman Co.'s outstanding stock consisted of 283,550 shares of common stock owned as follows: Shares
Stirton Oman, decedent
214,290
Stirton Oman, Jr. decedent's son
34,270
John (Jack) Allen Oman, decendent's son
34,270
Other family members
720
To support the valuation of decedent's stock in Oman Co. as reported on the estate tax return, petitioner supplied respondent's examining officer, Carey Frazier, a valuation report of such stock prepared by J.P. Foster of Touche Ross & Co. The report was dated June 12, 1979. Oman Co. was incorporated under the laws of the State of Tennessee in 1950. Prior to the formation of the corporation, the construction business had been operated by various members of the Oman family as a partnership. The business was started in 1876 by John *70 Oman, who concentrated on cut stone and masonry work. In 1881, the company was awarded a contract with the Nashville, Chattanooga and St. Louis Railroad, the first of many projects which the company was to perform for such railroad and its successors. From its organization as a corporation in 1950 until the time of decedent's death, Oman Co. has been viewed in the industry as primarily a heavy construction firm. At various times, the company has built highways, railroads, airports, bridges, pipelines, tunnels, dams, and missile bases. In 1975, Oman Co. was involved in constructing the Trans Alaska Pipeline over 152 miles. For Federal income tax purposes Oman Co. reported its income from its construction jobs on a completed contract method of accounting and used an accrual method of accounting with respect to other items of income. Oman Co. was a closely held corporation from the date of its incorporation until decedent's death. Its securities were not registered with the Securities and Exchange Commission and were not regularly traded in any market. The following statement reflects the record of sales of stock in Oman Co. from December 22, 1967, until the date of decedent's *71 death, March 18, 1977: Average
No. of
Price
Book Value
Percentage
Date
Buyer/Recipient
Shares
Per Share
Per Share
of Book
12/22/67
Immanuel Baptist
Church (gift)
4,200
12/27/67
Jack Massey-Purchased
from Immanuel Baptist
4,200
$7.14
$25.95 28.1
11/22/68
Jack Massey-Purchased
from Godwin Estate
52,500
14.28
31.86
44.8
12/24/69
Stirton, Jr., and
Jack Oman (gift)
180
01/05/70
Stirton, Jr., and
Jack Oman (gift)
180
12/30/71
Stirton, Jr. and
Jack Oman (purchased
from Jack Massey)
56,700
15.87
33.16
47.9
12/30/71
Belmont College (gift)
4,000
12/15/72
Stirton, Jr. and
Jack Oman (gift)
10,000
15.875
32.75
48.5
12/15/72
M.B.A. (gift)
600
7/73
Company Redeemed
Belmont College Stock
4,000
16.50
34.94
47.2
10/25/73
Company Redeemed
M.B.A. Stock
600
16.50
34.94
47.2
1973
Harpeth Hall (gift)
600
12/24/73
Stirton, Jr. and
Jack Oman (gift)
1,480
16.50
34.94
47.2
10/75
Company Redeemed
Harpeth Hall Stock
600
16.50
47.54
34.7
The following chart reflects the book value of the stock of Oman Co. from 1972 through 1977: Book Value
Earnings
Total
Share
Per Share
Per Share
Ratio
1972
$9,537,969
288,750
$33.04 $ (.31) N/M
1973
9,927,216
288,750
34.38
3.08
11.17
1974
11,309,344
284,150
39.80
6.21
6.41
1975
13,479,179
284,150
47.44
7.70
6.17
1976
15,818,856
283,550
55.79
9.69
5.76
1977
17,921,312
283,550
63.21
8.82
7.17
*72 The following chart reflects financial data extracted from the audited financial statements of Oman Co. prepared by Touche Ross & Co. for the years ending March 31, 1973, 1974, 1975, 1976, and 1977: OMAN CONSTRUCTION COMPANY, INC.
BALANCE SHEET
March 31
ASSETS
1977
1976
1975
1974
1973
CASH
(including
certificates of
deposit of
$5,700,000 in 1977
and $3,700,000 in
1976)
$ 8,571,734
$ 6,924,852
$ 3,853,952
$ 1,836,052
$ 1,222,925
ACCOUNTS RECEIVABLE
(no allowance for
doubtful
accounts considered
necessary): Current
1,458,457
1,902,692
1,894,035
2,214,381
2,365,566
Retainage
1,697,652
2,168,853
1,746,093
2,213,666
1,935,865
Life insurance
(Note I)
2,818,134
Joint ventures,
affiliates
and others
292,218
677,334
436,981
232,875
301,437
6,266,461
4,748,879
4,077,109
4,660,922
4,602,868
UNBILLED WORK ON
CONTRACTS
IN PROCESS
(Note A-1)
200,490
245,254
420,720
431,292
817,826
NOTES RECEIVABLE
70,000
PREPAID EXPENSES
60,034
64,944
55,328
56,739
79,883
REFUNDABLE TAXES
ON INCOME
264,122
264,122
274,442
6,278
INVESTMENTS AND
OTHER ASSETS: Investments in
joint ventures
(Notes A-3 and C)
1,110,188
760,314
1,047,319
1,731,671
2,765,211
Cash surrender
value of life
insurance
868,984
2,053,920
1,851,657
1,682,907
1,529,085
Land -- at cost
534,813
463,440
517,937
511,548
333,235
Investments in
affiliates
(Notes A-4 and D)
716,755
718,738
673,037
509,356
520,161
Other
28,000
35,500
35,500
7,500
7,500
3,258,740
4,031,912
4,125,450
4,442,982
5,155,192
EQUIPMENT AND
IMPROVEMENTS
(Notes A-5
and E)
5,633,968
6,912,550
6,831,706
6,545,998
6,439,857
$24,255,549
$23,192,513
$19,708,707
$17,973,985
$18,324,829
*73 OMAN CONSTRUCTION COMPANY, INC.
BALANCE SHEET
March 31
LIABILITIES AND
STOCKHOLDERS'
EQUITY
1977
1976
1975
1974
1973
CURRENT
LIABILITIES: Accounts payable
$ 1,164,851
$ 1,437,829
$ 1,167,810
$ 1,713,444
$ 2,129,076
Accrued expenses
103,787
137,600
130,917
145,443
144,889
Advance billings
on contracts
in process
(Note A-1)
94,060
53,798
361,107
348,733
Deferred joint
venture revenue
(Note C)
567,000
567,000
567,000
401,967
Taxes on income
(Notes A-2 & H): Federal
460,084
217,002
888,667
482,567
State and
foreign
205,877
113,605
321,739
108,800
80,928
Current portion
of long-term
debt (Note G)
25,841
25,841
22,841
31,371
24,611
TOTAL CURRENT
LIABILITIES
2,527,440
2,592,937
2,264,105
3,650,529
3,210,804
LONG-TERM DEBT
(Note G)
77,595
103,436
117,277
141,003
2,509,415
DEFERRED TAXES
ON INCOME
(Notes A-2 & H)
3,729,202
4,677,284
3,848,146
2,873,109
2,677,394
COMMITMENTS AND
CONTINGENCIES
(Note J)
STOCKHOLDERS'
EQUITY: Common stock, $10
par value per
share;
authorized 500,000
shares, issued
and outstanding
283,550 shares
2,835,500
2,835,500
2,841,500
2,841,500
2,887,500
Retained earnings
(Note B)
15,085,812
12,983,356
10,637,679
8,467,844
7,039,716
17,921,312
15,818,856
13,479,179
11,309,344
9,927,216
$24,255,549
$23,192,513
$19,708,707
$17,973,985
$18,324,829
*74 The notes to financial statements prepared for Oman Co. by Touche Ross & Co. for the years ending March 31, 1976 and March 31, 1977 provide in part as follows: A. Summary of Significant Accounting Policies:
* * * 5. Depreciation. Depreciation and amortization was computed using the straight-line method based on the estimated useful lives of the assets for all assets acquired prior to April 1, 1968. For all acquisitions subsequent to April 1, 1968, the declining balance method of depreciation is used at the rate of 200% for new equipment and 150% for use equipment, based upon the estimated useful lives of the assets. * * * E. Equipment and Improvements:
Equipment and improvements, at cost, is summarized as follows: March 31
1977
1976
Construction equipment
$21,553,294
$22,178,675
Trucks
2,645,769
2,636,134
Airplanes
1,564,422
1,513,437
Automobiles
185,253
180,047
Furniture and fixtures
200,449
197,654
Leasehold improvements
367,693
367,693
26,516,880
27,073,640
Less accumulated depreciation and amortization
20,882,912
20,161,090
$ 5,633,968
$ 6,912,550
* * * G. Long-Term Debt:
*75 Long-term debt consisted of the following: March 31
1977
1976
7.0% Land purchase obligation payable in ten semi-
annual installments of $5,950 plus interest
to August 1, 1978
$17,850
$ 29,750
6.0% Land purchase obligation payable in ten annual
installments of $10,941 plus interest to
June 20, 1983
76,586
87,527
Noninterest bearing obligation payable in annual
installments of $3,000 to April 17, 1979
9,000
12,000
103,436
129,277
Less portion due within one year
25,841
25,841
$77,595
$103,436
The two land purchase obligations are collateralized by land in Middle Tennessee with a net carrying amount of $208,749. H. Income Taxes:
The provision for income taxes includes the following: Year Ended March 31
1977
1976
Currently payable
$2,042,379 $1,994,516 Deferred
(948,082)
829,138 Investment tax credits
(57,857)
(217,613)
Foreign tax credits
(136,440)
(204,041)
$ 900,000 $2,402,000 I. Extraordinary Item:
Life insurance proceeds of $2,818,134 became due during 1977 under contracts maintained on the life of Stirton Oman. The excess of $1,320,017 over the *76 cash surrender value at the beginning of the year is nontaxable and is reported as an extraordinary item. J. Commitments and Contingencies:
The Internal Revenue Service has proposed substantial income tax deficiencies with respect to the year 1966 through 1973. Petitions contesting these proposed deficiencies have been filed with the United States Tax Court. * * * Other contingent liabilities include the usual liability of contractors for completion of contracts, possible liability in joint venture participation, and general and surety and loan agreements. Management is of the opinion, based on advice of counsel, that no material liability will result from pending litigation. The following table contains income statement data of Oman Co. for the years ending March 31, 1973 through 1977 extracted from audited income statements of Oman Co. for the years as shown: Oman Construction Company, Inc.
Audited Income Statement Data
Year Ending March 31st
1974
1975
1973
Restated *
Restated *
1976
1977
Income
Construction
Contracts
$23,232,207
18,456,584
17,396,744
17,046,014
13,977,140 Jt. Ventures
1,267,510
* 1,476,198
* 400,187
1,720,859
1,563,339 Gain on Sale
of Land
240,516
*
Other
295,671
* 435,199
673,998
495,743
591,822 Equipment Rental
* 70,773
2,529,221
3,092,881
1,418,111 Total Income
25,035,904
* 20,438,754
* 21,000,150
22,355,497
17,550,412 Cost & Expenses
Costs of
Lab., Mat., Etc.
17,806,285
11,393,740
10,951,791
10,781,763
9,797,311 Gen'l & Adm. Exp: Equipt. Rental
42,782
60,187
53,470
45,463
29,356 Depreciation
1,836,313
1,996,869
2,012,284
2,015,446
1,476,564 Equip. Rep.
& Maint.
1,133,888
1,453,322
1,355,201
1,215,044
1,140,919 Gas & Oil
88,661
104,010
143,443
216,934
141,064 Salaries-Officers
506,600
522,000
579,300
684,960
794,860 Salaries & Wages
412,606
437,665
479,028
545,235
566,893 Bidding &
Estimating
201,666
140,892
154,321
196,324
258,568 Travel
34,228
43,412
47,353
71,025
66,810 Rent
26,400
30,175
41,400
41,400
38,900 Amt'n of Leasehold
Impr.
11,563
11,740
12,715
15,392
16,471 Office
68,540
69,143
94,985
82,020
72,177 Heat, Light
& Power
17,779
17,580
20,194
24,934
27,527 Telephone
& Telegraph
24,194
22,254
25,290
25,440
28,351 Advertising
17,305
20,740
19,557
52,855
32,774 Dues &
Subscriptions
15,548
11,800
20,964
15,291
21,515 Donations
7,690
5,566
40,046
51,606
13,457 Legal & Auditing
Fees
49,786
24,259
133,092
77,594
54,288 Insurance: General
400,690
355,838
339,880
198,230
453,507 Life
15,052
44,120
32,579
93,444
(27,518)
Taxes &
Licenses-Gen'l
106,054
143,092
150,388
153,077
148,216 Taxes Payroll
359,753
432,392
343,249
339,732
312,209 Bad Debts
1,504
6,675
6,671
255,632
919 Total G & A Exp.
5,378,602
5,953,731
6,105,410
6,417,078
5,666,827 Interest
174,770
91,896
20,707
7,989
6,865 Total Costs & Exp.
23,359,657
17,439,367
17,077,908
17,206,830
15,471,003 Earn. Bef. Tax.
& Extra. Item
1,676,247
* 2,999,387
* 3,922,242
5,148,667
2,079,409 Prov. for
Inc. Taxes
787,000
* 1,466,000
* 1,867,000
2,402,000
900,000 Earn. Bef.
Extra. Item
889,247
* 1,533,387
* 2,055,242
2,746,667
1,179,409 Extraordinary Item
182,276
1,320,017 Net Earnings
889,247
* 1,533,387
* 2,237,518
2,746,667
2,499,426 Earnings Per Share
3.08 * 5.37 * 7.87 9.68 8.81  *77 The following table shows the dividend history of Oman Co. with respect to its common stock outstanding for its fiscal years ending March 31, 1972 through March 31, 1979. In addition to the cash dividends reflected in the table below, sometime after 1968, Oman Co. declared a 21 for 1 stock dividend, providing for 288,750 shares outstanding: Oman Construction Company
Dividend Record
Shares
Dividends
Dividends
Outstanding
Per Share
Total
3/31/72
288,750
$ .30
$86,625
3/31/73
288,750
3/31/74
284,150
.10
28,415
3/31/75
284,150
.40
113,660
3/31/76
n1 283,550   1.40
397,090
3/31/77 *
283,550
1.40
396,970
3/31/78 [2]
151,550
.40
100,220
3/31/79
151,550
.40
60,620
On or about March 31, 1978, Oman Co. redeemed 132,000 shares of stock owned by decedent at $35 per share for a total of $4,620,000. This redemption enabled the estate to satisfy its Federal estate tax liability as reported on the estate tax *78 return and State of Tennessee inheritance tax liability. At a later time, the executor was informed of a tentative settlement with the Appeals officer for $49 a share and as a result the number of shares redeemed was adjusted to equal the $4,620,000 based on $49 per share. The last will and testament of decedent provides in pertinent part as follows: It is my intent that, so long as my estate owns an interest in Oman Construction Company, Inc., my Executor and/or Trustee, together with my sons, should they be shareholders, shall retain and exercise the majority voting power in the event I may own a majority of the said stock at the time of my death; and, in the event I do not own a majority of the said stock at the time of my death, it is my intent that the voting power of the stock owned by me at the time of my death shall be retained and exercised by my Executor and/or Trustee, together with my sons, should they be shareholders, so long as my estate owns any interest in said corporation. Nothing herein shall be construed as limiting the right of the executor to sell all of my shares of the said capital stock, or to effect the liquidation of the said corporation, subject only *79 to the provisions of paragraph 1 above. * * * Should I, at the time of my death, own a majority of the then issued and outstanding shares of the capital stock of Oman Construction Company, Inc., my Executor shall not sell such number of the said shares as will leave remaining in my estate less than a majority of the said shares, unless all such shares be disposed of; provided, however, this shall not preclude any sales to my sons made in accordance with the provisions of paragraph 4. Notwithstanding the provisions of paragraphs 2 and 3 above, but subject to the provisions of paragraph 1, the Executor shall have the right to sell to each of my sons, Stirton Oman, Jr., and John Allen Oman, such number of the said shares as they, or either of them, may wish to purchase; provided, however, before making any such sale to either of my sons, the effect of which sale shall be to leave remaining in my estate less than a majority of the then issued and outstanding shares, my Executor shall enter into an appropriate agreement with my son or sons, under which agreement there shall be created a voting trust in which there shall be vested the voting power of all shares owned by my son, or *80 sons, and my estate, to the end that the voting power of the said shares shall be exercised en bloc; and the said agreement shall further provide that the certificates representing shares sold to my sons, and the shares represented thereby, may not be sold or transferred, so long as my estate continues to hold any such shares, without first being offered to my estate at a price not exceeding the fair and reasonable book value of such shares, determined as of the close of the month in which such offer be made; * * * The land item listed under investments and other assets on Oman Co.'s balance sheet as of March 31, 1977, consisted of about 15 tracts of land acquired by the corporation over a period of years and carried on its books at cost. Decedent owned the land, office building and repair shop in which Oman Co. operated its headquarters in Nashville, Tennessee, and decedent leased the land to Oman Co. up until his death. The rent was $1,700 a month. After decedent's death, Oman Co. purchased this land from the estate for the amount of $700,000. Oman Co. owned 71.43 percent of the affiliate, Southeast Tractor and Equipment Co., with decedent owning 10 percent of such stock and *81 the Oman family owning the remaining 18.57 percent. On the date of decedent's death this affiliate was a holding company owning marketable securities and approximately 92 acres of undeveloped land in Williamson County, Tennessee. The land and a building thereon were leased to Oman Co. at $15,000 per year and were used in part by the company to store construction equipment. On March 31, 1977, Oman Co. owned 49.67 percent of the stock in Nashville Flying Service, Inc., with the balance of the stock owned by Ingraham Corp. and Edward Jones, d/b/a Avian. The principal activity of Nashville Flying Service, Inc., was the selling of aviation fuel to Oman Co. for its aircraft. On March 31, 1977, Oman Co. owned 50 percent of the stock of M & O Investments, Inc., which was incorporated on November 9, 1959. The principal asset of this corporation was the land abutting Interstate 65 in Nashville, Tennessee, which was leased by the corporation at a yearly rental of approximately $7,150 during the year ending October 31, 1975. On its income tax return filed for the taxable period ending October 31, 1973, M & O Investments, Inc., reported a capital gain of $407,561.38 from the sale of real *82 property in which it had a cost basis of $50,041.38. Most of the construction equipment owned by Oman Co. was heavy earth-moving equipment which was designed to be operated for many years with the replacement of parts such as gears, gaskets, seals, O-rings, filters, and the teeth on digging parts. The company practiced a formal maintenance program whereby daily checks were made of the equipment's oil, filter and fuel. Periodically, the company checked all of its construction equipment for wear and tear. At its headquarters in Nashville, Tennessee, Oman Co. operated a repair shop for the repair of its heavy construction equipment. In such sops, Oman Co. performed its own maintenance and repairs on its equipment. Oman Co. recorded the repairs performed on its construction equipment on maintenance cards which showed the service performed on such equipment and the condition of the equipment. Oman Co. followed the policy of keeping its construction equipment over a long period of time. In 1965, the company had numerous pieces of construction equipment that ranged from 13 to 27 years old. Each year thereafter, the company acquired additional items of construction equipment with *83 very few disposals. As of March 31, 1977, Oman Co. had several pieces of construction equipment acquired at a cost of $3,147,135 on which the company had performed maintenance in the total amount of $4,305,581. The total construction equipment owned by Oman Co. at of March 31, 1977, was acquired at a cost of $21,525,293.76, and on that date the company had spent almost $13,000,000 in maintenance and repair of such equipment. Some of the equipment returning from the Alaska Pipeline project was in poor condition due to the severe weather conditions in Alaska. As a result, new equipment was purchased in 1978 by Oman Co. in the approximate amount of $3.5 million. During the taxable years ending March 31, 1975 and March 31, 1976, Oman Co. traded or sold the construction equipment for the amounts shown on the list below: Date
Trade In
Ratio
Date
Traded
Allowed or
to
Description
Acquired
Cost
or Sold
Sales Price*
Cost
N.W. 800 Shovel
1-31-63
$ 50,000
8-21-74) B.E. #71B Shovel
4-02-63
104,120
8-21-74))
$ 83,108 49%
Wayne Street Sweeper
10-01-51
13,850
8-21-74) CAT 631B Tractor
Scrapper
11-12-63
74,486
7-17-74  19,000 26%
CAT 631B Tractor
Scrapper
11-11-63
74,486
7-22-74) 27,500 37%
L.W. 35T R. Dump
6-17-65
66,964
5-15-74) L.W. 35T R. Dump
6-17-65
66,963
5-15-74) L.W. 35T R. Dump
9-13-65
66,720
5-15-74))
139,456 34%
L.W. 35T R. Dump
9-13-65
66,720
5-15-74) L.W. 35T R. Dump
8-11-66
68,752
5-15-74) L.W. 35T R. Dump
8-11-66
68,752
5-15-74) CAT D-8 Tractor
5-11-65
40,475
4-02-74  24,000*
59%
CAT #641 Traxcavator
4-14-65
92,121
7-18-74  23,750 26%
CAT #641 Traxcavator
4-28-65
92,121
7-18-74  23,750 26%
Robbins Rotary Drill
4-03-67
99,274
9-24-74  70,000 71%
CAT-D-8 Tractor
9-11-67
50,866
10-10-74))
40,000 73%
Blade
8-24-65
4,260
10-10-74) Robbins Rotary Drill
4-23-71
126,515
10-11-74  120,000 95%
CPT 650 PN Drill
4-27-70
90,947
9-24-74  55,000 60%
M.F. Dozer
3-31-72
9,840
4-19-74  7,000 71%
CAT Front Loader
4-01-72
105,307
7-15-74  100,000 95%
WABCO Tractor
Scrapper
10-03-68
71,255
10-04-74  32,000 45%
CAT 35T R. Dump
8-07-67
73,939
6-03-75  64,652 87%
CAT 35T R. Dump
8-07-67
73,939
6-03-75  64,652 87%
CAT 35T R. Dump
8-07-67
73,939
6-03-75  64,652 87%
CAT #988 Traxcavator
10-27-70
83,890
6-03-75  70,000 83%
CAT D-8 Dozer
5-10-68
63,377
9-02-75  45,000 71%
CAT D-9 Tractor
w/power unit
6-12-64
58,093
10-06-75  16,000 28%
Total
$1,931,971
$1,089,520 *84 During the years 1977, 1978 and 1979, Oman Co. had equipment disposals in the respective amounts of $672,665, $827,993 and $141,668. During the years 1977, 1978 and 1979, Oman Co. made additions to land, equipment and improvements in the following respective amounts: $886,118, $4,271,703 and $989,730. As of March 31, 1977, Oman Co. had 40 construction contracts which were uncompleted (excluding joint ventures). These contracts had a face amount of about $28.4 million. As of March 31, 1975, the company had about 48 uncompleted contracts at a face amount of $40 million, and on March 31, 1976, the company had 39 uncompleted contracts with a face amount of $26 million. As of March 31, 1978, the company had 56 uncompleted contracts at a face amount of $26.8 million. The major contracts which were uncompleted as of March 31, 1977, were with repeat customers of the company, such as the State of Tennessee and Daniel Construction Co. Five of the jobs outstanding as of March 31, 1977, were in the range of $1.6 million to $9.3 million and totaled $27.1 million of the $28.4 million in contracts uncompleted on such date. Most of the 40 uncompleted jobs as of March 31, 1977, were for *85 contracts under $100,000 and losses were projected only on six job orders, some of which, according to the records of the company, appear to be with related entities. The largest loss projected was on a contract with itself, Oman Co., in the face amount of $70,000. The loss was projected at $63,000 according to the company records. Other projected losses were with respect to a contract with Stirton, Jr., and Jack Oman ($6,000); Stirton-Murray Lane ($2,000); Belmont College ($1,000); and the Brown property ($5,000). When decedent died on March 18, 1977, he was 74 years old and was visiting his new home at Cat Cay in the Bahamas. On the date of death, decedent also had a home in Fort Lauderdale, Florida. He had owned the Fort Lauderdale home for more than 20 years. In the latter years of his life, decedent and his wife spent the period of time from Thanksgiving until spring in their Fort Lauderdale home. During the last 2 years of his life, decedent had no specific assignments or duties at Oman Co. During such years, decedent and his wife would travel to Florida for extended visits and decedent would fly back and forth from Fort Lauderdale to Nashville to spend a few days if *86 his services were needed at Oman Co. During the last 2 years of decedent's life, his son, Jack A. Oman, was in charge of the day-to-day operations of the company and continued to operate the company as its chief executive officer after his father's death until the time of the trial of this case. The following table reflects compensation received by the Omans for the years shown: Time
Stock
Amount of Compensation
Name
Title
Devoted
Owned
1974
1975
1976
1977
Stirton Oman
Chairman
of Bd.
As req.
76%
$125,000
$125,000
$175,000
$200,000
Stirton Oman,
Jr.
President
All
12%
62,700
81,650
106,500
108,000
Jack Oman
Exec. VP/Sec.
Treasurer
All
12%
53,500
77,100
101,200
127,400
Practically all of the work performed under contract by Oman Co. was obtained through invitation-only competitive bids. The initial bids were prepared under the supervision of Jack and his brother, Stirton, Jr., and were subject to review by Stirton, Sr., when he visited the office. When a job was performed as a joint venure, Oman Co. participated in preparing the bid which was then submitted by the joint venture. In his notice of *87 deficiency, respondent determined a deficiency in petitioner's estate tax liability in the amount of $3,642,528.60 with the following explanation: It is determined that on the date of decedent's death the fair market value of his 214,290 shares of the capital stock of Oman Construction Company, Inc., was $19,286,100.00 rather than $7,500,150.00 as reported. Accordingly, the taxable estate is increased by $11,785,950.00. In his original report, respondent's examining officer, Carey Frazier, recommended that a value of $65 per share be placed on decedent's 75.6 percent ownership interest in the common stock outstanding in Oman Co. Respondent's District Director prepared a proposed notice of deficiency to be issued to the estate in which the only adjustment was the increase in the gross estate based on the determination that decedent's interest in the stock in Oman Co. had a value of $65 a share instead of the $35 a share as reported on the estate tax return. This proposed notice of deficiency was forwarded to respondent's District Counsel who suggested that prior to issuance of the notice, an effort should be made to obtain the opinion of a valuation engineer regarding the value *88 of the company's construction equipment. The District Director requested assistance from respondent's engineer group manager in Atlanta for valuation and appraisal of decedent's stock in Oman Co. On October 31, 1980, Carey Frazier received permission from Oman Co. for respondent's valuation engineer, Richard Hedenquist, to visit the company on November 11, 1980, for the purpose of determining the value of the company's assets. On November 10, 1980, this permission was withdrawn. In a report dated December 1, 1980, Mr. Hedenquist advised the District Director in Nashville, Tennessee, that based on a discussion with Revenue Agent Horton about the operations of the company and the engineer's prior audit experience of Oman Co., the value of the depreciable assets of the company was approximately $19 million at the time of death and not the depreciated value listed as $5,633,968. As a result of such valuation of assets, the engineer estimated the value of decedent's interest in the stock of the company to equal about $90 per share. On December 3, 1980, the District Director sent petitioner a copy of the supplemental report of Carey Frazier in which the value of decedent's interest *89 in Oman Co. stock was changed from a value of $65 per share to $90 per share. A revised notice of deficiency was prepared which valued decedent's stock in Oman Co. at $90 per share based on Mr. Hedenquist's appraisal of the company's equipment at $19,286,100. This revised notice was mailed to petitioner on December 12, 1980, and the petition assigning error in the determination made in this notice was filed on February 17, 1981. After the filing of the petition, the case was referred to respondent's Appeals Office. This office requested Mr. Hedenquist to work further on his report, and on September 16, 1981, the chief of the Appeals Office in Nashville, Tennessee requested from District Counsel a 60-day extension of the consideration of the case by the Appeals Office to permit Mr. Hedenquist to complete his valuation of Oman Co.'s equipment. This request was granted by the District Counsel. In his final engineering and valuation report of March 24, 1982, Mr. Hedenquist determined the fair market value of Oman Co.'s assets to be as follows: Construction equipment
$15,604,660
Construction trucks
1,590,918
Aircraft
1,762,500
Furniture and fixtures
34,630
Automobiles
90,024
Total
$19,082,732
*90 Mr. Hedenquist had audited Oman Co. in the early 1970's and since such audit had observed the company's equipment on job sites as well as in the maintenance shops of the company in Nashville, Tennessee. During such visits, Mr. Hedenquist observed that the company maintained its equipment in good shape and that its repair shops were capable of making just about any repair of heavy equipment. Mr. Hedenquist had seen about 75 to 80 percent of Oman Co.'s equipment which he valued as of the date of decedent's death during his travels to job sites and at the company's yard in the years 1970, 1971, 1972 and 1981. After compiling a list of equipment which petitioner agreed was property of the company as of the date of decedent's death, Mr. Hedenquist referred to the 1977 editions of "Green Guide for Construction Equipment" and "Green Guide for Older Equipment" for basic equipment values of each of the pieces of equipment owned by the company. The Green Guide books are a nationally recognized standard of selling prices of various types of construction equipment listed by manufacturer, model number and year of sale. The purpose of such publication is to provide cost information for *91 equipment sold to establish a basis for valuation of similar equipment. The publisher of such book collects samples from several thousand sellers throughout the United States, eliminates the high prices and the low prices and then averages the costs of the various pieces of equipment by make and model. For the most part, the value used by Mr. Hedenquist in his report from the Green Guide books was the used resale value shown for the equipment. Due to the fact that Mr. Hedenquist was not able to identify accessories which may be attached to a particular piece of construction equipment, he used the basic equipment to compute the value which, in his opinion, would cause his valuations to be on the conservative, low side. In determining the value of the equipment, Mr. Hedenquist did not consider any inventory of parts separate from the specific items of equipment. When he visited Oman Co.'s yard in 1981, Mr. Hedenquist saw parts in bins and a completely rebuilt engine wrapped in plastic, but he made no attempt to determine the value of any inventory of parts which the company may have had on the date of decedent's death. On April 29, 1982, respondent's Appeals officer held a settlement *92 conference with petitioner's counsel and Jack and Stirton Oman, Jr. and two other officers of Oman Co. Prior to the conference, petitioner had submitted to the Appeals officer (1) a statement of W. E. Abernethy regarding his valuation of the stock in Oman Co. dated October 12, 1981; (2) a letter dated July 10, 1981, to Jack Oman from Ben R. Rechter regarding his valuation of the stock in Oman Co.; and (3) a letter dated April 22, 1982, from Stirton Oman, Jr., wherein he contended that Mr. Hedenquist had overstated the value of Oman Co.'s equipment by more than 40 percent and that adding thereto a 25 percent cost of repair and 6 percent sales commission resulted in a 71 percent over-valuation of the equipment. At the settlement conference, the parties disagreed on the value of the shares. On May 3, 1982, the Appeals officer telephoned petitioner's counsel and made a counter-proposal of $49 per share as the agreed value of the stock, which petitioner's attorney and petitioner accepted. On May 27, 1982, respondent's Appeals officer mailed a proposed stipulation-decision document to petitioner's counsel based on the valuation of the stock at $49 per share with a form letter No. *93 1220 which stated that the proposed decision document was subject to review, signature and filing with this Court by District Counsel. To support his valuation of $49 per share, respondent's Appeals officer gave great weight to the appraisal of Mr. Abernethy who estimated the value of the stock in Oman Co. at $42 per share and to the appraisal of Mr. Rechter who estimated the value of the stock at $42.92 per share. On June 2, 1982, petitioner's counsel returned to respondent's Appeals Office the original ane two signed copies of the proposed stipulation-decision document. Two days later, petitioner's counsel requested that the proposed stipulation-decision document be returned to him to enable petitioner to claim additional administrative expenses. The Appeals Office complied with the request immediately and also requested from District Counsel a 60-day extension to conduct further consultations with respondent's valuation engineer.On June 8, 1982, petitioner's counsel sent to respondent's Appeals Office a signed stipulation-decision document and enclosed a computation prepared on behalf of the estate reflecting a final estate tax due in the amount of $797,255.67. This stipulation-decision *94 document was never signed on behalf of respondent and was never filed with this Court. On August 9, 1982, the chief of the Appeals Office in Nashville requested valuation assistance from the engineering and valuation branch of the corporate tax division of the Appeals Office. On or about March 9, 1983, a member of the staff of the Engineering and Valuation Branch of the Corporation Tax Division in respondent's National office advised the Appeals officer that his appraisal was going to be under $35 per share. On March 16, 1983, respondent's Appeals officer, the chief of the Appeals Office, respondent's trial attorney and the Assistant District Counsel met and agreed that an appraisal from a valuation expert in the private sector would be obtained by District Counsel and the Appeals Office would retain jurisdiction of the case. Respondent employed the national appraisal firm of Marshall and Stevens, Inc., to value the stock of Oman Co. and the heavy construction equipment which was an underlying asset of Oman Co. On May 5, 1983, respondent's District Counsel sent Marshall and Stevens the following material: the audited financial statements of the company for the years ended 1972 *95 through 1979; the dividend record of the company for the same years; the record of sales of stock in such company; the valuation report of Touche Ross & Co. dated June 12, 1979, valuing the stock at $37.41 per share; the appraisal reports of Mr. Abernethy and Mr. Rechter; the letter of April 22, 1982, from Oman Co. in response to the valuation report of Mr. Hedenquist; the final engineering report of Mr. Hedenquist; the report of Mr. Whiteside dated March 27, 1981; and a copy of the examination report of Mr. Frazier with pertinent workpapers. Leonard Landsman, a senior financial analyst for Marshall and Stevens, was responsible for the valuation and he considered the following techniques appropriate to value Oman Co. with each technique weighted as shown in the table below: Value
Weighted
Enterprise
Per
Weight
Enterprise
Technique
Value
Share
Factor
Value
Future Income
$31,576,000
$114.91
1
$ 31,576,000
Net Book Value
17,921,000
63.21
1.5
26,881,500
Orderly Liquidation
27,554,000
97.19
2
55,108,000
Forced Liquidation
23,737,000
83.73
2
47,474,000
Price/Earnings Ratios
25,215,000
88.94
3
75,645,000
Dividends
14,981,000
52.84
3
44,943,000
Return on Investment
17,169,000
60.56
3
51,507,000
Adjusted Book Value
31,370,000
110.65
4
125,480,000
19.5
$459,614,500
$459,614,500/19.5 =
$ 23,569,974
Rounded to
$ 83.14
$ 23,570,000
*96 Mr. Landsman concluded that a premium should be added to decedent's stock for the control position. He used a formula for applying this premium, arriving at a value equal to $90.53 per share before using a 10 percent discount for lack of marketability of the large block of stock. [1] After using the lack of marketability discount, his conclusion was that the fair market value of decedent's stock in Oman Co. as of March 18, 1977 was $81.48 per share, which was the valuation respondent submitted on brief. *97 On June 21, 1983, this Court granted petitioner's motion for leave to file a supplemental petition. Therein petitioner alleged that the Appeals Office had exclusive settlement jurisdiction of the stock valuation issue and the function of the District Counsel was simply to sign an appropriate decision document and to file it with this Court for signature by a judge of this Court. In addition, petitioner prayed that District Counsel be directed to return the case to Appeals for preparation of an appropriate decision document to correctly reflect a deficiency in tax arising from the increase in the valuation of stock from $35 a share as reported to $49 a share after allowance of additional administrative expenses incurred after the filing of the estate tax return. On August 24, 1983, petitioner filed an amendment to supplemental petition wherein petitioner alleged that the form letter No. 1220 was an Appeals Office statement to petitioner that a settlement agreement had been reached in the Appeals Office in a case pending in the Tax Court and such letter constituted an acceptance of petitioner's oral offer of compromise of the stock valuation issue at $49 per share and amounted *98 to conclusive evidence that a settlement agreement for this valuation had been reached in the regional Appeals Office having exclusive jurisdiction to settle the case. On December 3, 1984, petitioner amended the supplemental petition to allege that respondent was estopped from denying the validity of the settlement of the stock valuation question reached with the Appeals officer. Petitioner renewed its prayer in the original petition that there is no deficiency in estate tax.Petitioner also asked that in the event this Court should fail to find a valuation of decedent's stock in Oman Co. less than $49 per share, District Counsel should be directed to implement the settlement agreement reached with the Appeals Office and to limit the deficiency in tax to an amount arising from the increase in the valuation of the stock to $49 per share after allowance for additional administrative expenses incurred after the filing of the estate tax return. OPINION Section 2031(a) provides that the value of the gross estate of the decedent shall be determined by including therein the value at the time of death of all property in which decedent had an interest. Section 2031(b) specifically provides *99 that the value of stock of a closely held corporation which cannot be determined by reference to market sales or bids or asked prices shall be determined by taking into consideration, along with all other relevant factors, the value of stock of corporations that are publicly traded which are engaged in the same or similar business. Valuation of the stock of a closely held company is not an exact science and is, by its very nature, an approximation derived from all the evidence. Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. See Palmer v. Commissioner,523 F.2d 1308 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. Fair market value is defined as the price for which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. Section 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright,411 U.S. 546, 551 (1973); Estate of Heckscher v. Commissioner,63 T.C. 485, 490 (1975). *100 See McShain v. Commissioner,71 T.C. 998, 1004 (1979). Valuation of stock is a question of fact, and the trier of fact has a duty to weigh all relevant evidence and to draw appropriate inferences therefrom. The question is one of judgment rather than mathematics. Hamm v. Commissioner,325 F.2d 934, 938-940 (8th Cir. 1963), affg. a Memorandum Opinion of this Court, cert. denied 377 U.S. 993 (1964). A list of factors that should be considered in the determination of the value of stock in a closely held corporation is set forth in section 20.2031-2(f), Estate Tax Regs. These factors include the company's net worth, past and prospective earnings records, dividend-paying capacity, and other relevant factors. "[O]ther relevant factors" are stated to include -- the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight *101 to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * There is no controlling formula for applying these factors. O'Malley v. Ames,197 F.2d 256, 258 (8th Cir. 1952). The parties and their experts differ greatly on the value of the stock of Oman Co. owned by decedent on the date of his death. As set forth in our findings of fact, petitioner originally valued decedent's ownership of stock in Oman Co. at $35 per share for a total valuation of decedent's interest of $7,500,150. In his statututory notice of deficiency, respondent determined that the stock was worth $90 per sahre for a total valuation of decedent's interest of $19,286,100. In the petition, petitioner asserted that the book value of the stock was $63.20 per share. In a supplemental petition, petitioner claimed in the alternative that the value of the stock was $49 a share based on the proposed stipulation-decision document forwarded to petitioner's counsel by an Appeals officer. At trial, petitioner presented the testimony of several expert witnesses. For example, J. P. Foster valued the shares *102 at $37.42 a share and the Manufacturers' Appraisal Co. valued the stock at $40.35 per share for a total value of $8,646,600. On brief, respondent contends that the fair market value of the shares was equal to $81.48 per share. Respondent also presented the testimony of expert witnesses at trial, one of whom, from the appraisal firm of Marshall and Stevens, Inc., valued the stock at $81.48 per share for a total value of $17,460,349.20. On brief, respondent based his valuation of decedent's interest in Oman Co. on the net worth or the net asset value approach. Respondent computed 75.6 percent of what he considered to be the minimum value of the company's assets as of March 18, 1977, using the company balance sheet as of March 31, 1977, as his starting point.Respondent noted that the company had a net worth of approximately $18 million, based on assets of more than $24 million and liabilities of about $6 million. Respondent concluded that decedent's approximate 75 percent interest in Oman Co. would be thus equal to $13.5 million. However, respondent noted that the equipment and improvements on the balance sheets were listed at the depreciated value of $5.6 million when, according *103 to the best evidence available, the current value of such assets was $19 million. Respondent thus concluded that the value as reflected on Oman Co.'s balance sheet was understated in the amount of $13.4 million and added this amount to the $18 million net worth reflected on the company's balance sheet, arriving at a total net worth of $31.4 million. Respondent concluded that decedent's approximate 75 percent interest would thus equal approximately $23.5 million or about $6 million more than respondent had maintained was the fair market value of decedent's interest in the company. Respondent justified this net worth approach by pointing out that decedent owned over 75 percent of the company and pursuant to Tennessee law he could dissolve the corporation and sell all of its assets. [2]
Respondent supports his valuation by noting that Oman Co. maintained its equipment in excellent *104 condition by spending over $1 million a year during the five prior years to repair and maintain the equipment. Respondent also notes that the value of the equipment is reflected in the amount received for the known disposals of equipment by the company during the years 1975, 1976 and 1977 in the respective amounts of $2,529,221, $3,092,881 and $1,418,111, and in the income realized from equipment rentals. In those same 3 years, the company realized a total of $7 million form equipment rentals. Despite respondent's reliance on the net asset valuation approach, respondent also maintains that a capitalization of earnings approach results in a minimum valuation of decedent's stock in Oman Co. at $81.48 per share. Respondent relies on the report of his expert witness from the appraisal firm Marshall and Stevens. The report considered the company's net worth, prospective earning power, dividend-paying capacity and other relevant factors. In the appraisal report, Marshall and Stevens considered the following factors: (1) Net book value: The net worth of the firm as reflected on the current balance sheet was determined by the expert to produce a value of $63.21 per share for a total *105 of $17,921,000 without any adjustment to the assets to reflect the current value of such assets. (2) Adjusted book value: This value was determined by adjusting the value of the equipment of the company to reflect the fair market value as determined by respondent's engineer using the Green Guide, resulting in the corporation's stock having a value of $110.65 per share for a total of $31,370,000. (3) Capitalization of future earnings: The earnings of the company were projected into the foreseeable future of 10 years on the assumption that the future earnings of the company would be significantly increased from the earnings for the year ending March 31, 1977, based on the industry's predicted need to rebuild the nation's highways and bridges. The expert determined that the normal earnings of the corporation would increase by 10 percent per year after 1978 until 1987 when the income would level off. Normal earnings of the company were projected to average 8.5 percent which was slightly more than the 8.3 percent of total income for the 5 years ended March 31, 1977, and slightly less than the mean between that 8.3 percent and the 5-year weighted average of 9.1 percent or 8.7 percent. *106 The projection further determined that "normal" earnings would reasonably be perceived by a knowledgeable buyer at about 50 percent above that reported due to the fact that Oman Co. was a closely held corporation. After arriving at the projected income for each of the years involved, the expert used a discount rate of 1-1/2 times the so-called "riskless" rate on Government securities and arrived at a present worth of the projected adjusted income of $114.91 per share for a total of $32,576,000. (4) Valulation based on capitalization of dividends: Pursuant to this approach, respondent's expert looked to the ability of the company to pay dividends without seriously impacting on its operations as another indication of the value of the enterprise. Under this approach the presumption was that if Oman Co. was publicly traded a knowledgeable investor would expect to receive cash dividends similar to those paid by the 10 publicly traded companies selected by the expert as similar general contractors. Using Oman Co.'s 5-year average net earnings, and the last 5-year payout rate of selected comparable companies, respondent's expert determined that Oman Co. would have paid dividends averaging *107 $515,330 per year resulting in a total stock valuation of $52.84 per share for a total of $14,981,000. (5) Valuation based on comparable price/earnings ratio: In making this comparison, respondent's expert selected companies of similar nature in the same line of business whose shares are publicly traded with comparable price/earnings ratios. Respondent's expert recognized that shares of a closely held corporation must be valued at a discount from the multiples applied to publicly traded shares in order to take into account the relative lack of marketability and financial information pertaining thereto. He also recognized that a premium was paid over market price for the control element inherent in a closely held corporation and therefore concluded that a net premium of 25 percent over the average multiple determined for the heavy construction industry should be used. In addition, respondent's expert determined that Oman Co.'s average earnings should be "normalized" by 50 percent or to $2,521,000 per year. The enterprise value of the corporation based on this approach was determined to be $88.94 per share for a total of $25,215,000. (6) Valuation based on liquidation of assets: *108 Under this approach, respondent's expert determined that in an orderly liquidation the company should realize 80 percent of the fair market value of its equipment and 60 percent of the fair market value of such equipment under forced liquidation, resulting in indicated values of $27,554,000 and $23,737,000, respectively, or $97.19 per share and $83.73 per share, respectively. Respondent's expert considered this approach a viable one only if a potential purchaser of Oman Co. was interested in discontinuing the business and perceived that a greater return on his investment could be obtained by liquidating the company and paying its obligations. In the expert's view, the highest and best use of Oman Co. was to continue its operation in view of the company's long history of successful operations, sizable backlog of work and the projected cyclical upturn in the industry. (7) Valuation based on past history of sales of stock: Due to the lack of evidence that any of the past sales of stock of Oman Co. were at arm's length, respondent's expert did not consider such approach a viable basis for the valuation of the Oman Co. stock. However, the expert did review a schedule of 71 business *109 enterprises sold during the calendar year 1977 which indicated that 49 of such companies sold at premiums over book value while only 22 sold at a discount from book value. (8) Valuation based on return on investment: Under this approach, respondent's expert determined the return on common equity of the 10 selected publicly held companies for the period ending March 31, 1977, as an average of 17.69 percent which was based on post-tax income. Respondent's expert referred to the figures compiled by Robert Morris Associates for smaller closely held heavy construction companies as 16 percent for such year based on pre-tax income. Using Oman Co.'s 1977 earnings, adjusted as before by 50 percent, respondent's expert determined that the value of the company based on the post-tax incomes of the publicly held companies was $12,469,000 while based on pre-tax incomes of the smaller closely held companies, the value of the company was $21,870,000. The average of the two results provided a valuation of $60.56 per share for a total of $17,169,000. We have set forth in our findings the range of values various methods of valuation yielded as the per share value of the stock held by decedent *110 on the date of his death. Rather than relying on a single approach, respondent's expert based his final valuation on a weighted average of the results of the various approaches. He applied what he considered appropriate weights to each of the results based on the degree of strengths and weaknesses he perceived in using each approach. Because it was the most speculative, the expert assigned the lowest weight factor of 1 to the future income approach. To the net book value approach, he assigned a weight factor of 1.5. To the orderly liquidation approach and forced liquidation approach, the weight factor of 2 was assigned. To the price/earnings approach, dividends approach, and return on investment, a weight factor of 3 was assigned, with the greatest weight factor of 4 assigned to the adjusted book value approach. Based on the correlation of the various approaches used in this report, respondent's expert determined the weighted value of Oman Co. was $83.14 per share for a total of $23,570,000. Respondent's expert decided that a control premium of 20 percent should be added to decedent's stock for control. Marshall and Stevens used a formula in applying the premium and concluded *111 that the value of the stock was equal to $90.53 per share. The expert then applied a 10-percent discount to such value due to the lack of marketability of the large block of stock. In the expert's view, this so-called blockage limited the number of potential purchasers, resulting in the fair market value of decedent's stock in the company as of March 18, 1977, being $81.48 per share for a total of $17,460,349.20. Petitioner computed the fair market value of decedent's stock by using the price/earnings ratio of the four companies listed by examining agent Frazier as most comparable to Oman Co., contending that this valuation was in accordance with the guide lines of Rev. Rul. 59-60, 1959-1 C.B. 237. The four companies used by petitioner and their price/earnings ratios, using 5-year averages, were as follows: Morrison-Knudsen Co.
5.6
Turner Construction Co.
6.1
Perini Corp.
5.0
Parsons Corp.
8.0
Petitioner computed the average of these price/earnings ratio to be 6.1 and applied this to the average 5-year earnings per share of Oman Co. which was $5.91 per share. This resulted in a valuation based solely on earnings of $36 a share. Petitioner then *112 added a control premium of 25 percent, yielding a total of $45. Petitioner argues that we should apply the rationale of Estate of Huntsman v. Commissioner,66 T.C. 861 (1976), and therefore give a weight of 3 to the valuation based solely on earnings, a weight of 1 to book value, and discount the result by 12 percent due to the loss of Stirton Oman, who was a key man, yielding a total value per share of $43.80. Petitioner also deducted a discount for lack of marketability of 20 percent yielding $35 a share which petitioner concluded we should adopt as the fair market value of decedent's shares in Oman Co. on March 18, 1977. When valuing stock of an operating company, primary consideration should be given to earnings, whereas valuation of a holding or investment company requires valuation of the underlying assets. [3] In the instant case, although Oman Co. was an operating company, it owned substantial assets, including construction equipment. We therefore conclude that in this case the value of the company's underlying assets should be considered as well as its earnings. *113 The value of the stock of a closely held company is directly related to the value of the assets underlying the stock. In valuing stock, it is generally the fair market value of the assets rather than their book value or cost which is significant. Oman Co.'s balance sheets reflect a substantial investment in machinery and equipment and substantial expenditures for equipment repairs. [4] The record is clear that Oman Co.'s construction equipment had a value at the date of decedent's death in excess of its book value. The construction equipment had a book value of $5.6 million at the date of decedent's death. However, the true cash value of this equipment at the time of decedent's death was clearly in excess of its book value. Some equipment that had been completely depreciated on the company's books at that time had a market value. The more difficult problem is determining the fair market value of the equipment. *114 In our view, the information contained in the Green Guide books is the best available evidence to use in determining the fair market value of Oman Co.'s construction equipment. Based on the report of Mr. Hedenquist, we conclude that the fair market value of Oman Co.'s machinery and equipment on March 31, 1977, was approximately $19,000,000. Mr. Hedenquist used Mr. Whiteside's report as well as copies of the company's depreciation schedules for the years March 31, 1965 through March 31, 1977, along with copies of invoices, purchase orders, and other documentation to establish a base for his report. Mr. Hedenquist then established a cost, year by year, using base machine costs. He determined the fair market value on an item-by-item basis, using the individual values for specific base machines as shown in the Green Guide. As petitioner points out, some items of machinery or equipment will sell below the Green Guide price and other items will sell above that price. However, this record shows that Oman Co.'s equipment was kept in excellent condition. Jack Oman testified that some of the equipment which had been on lease in Alaska was not in good condition. This testimony was *115 general and did not show that all Oman Co.'s machinery and equipment was not worth approximately the Green Guide value. The Green Guide is nationally recognized as a standard listing of selling prices of construction equipment according to manufacturer, model number and year of sale. Accessories were listed as a separate unit on Oman's Co.'s depreciation schedule. In situations where Mr. Hedenquist was unable to compute the value of all accessories on all equipment, he computed the value from the value of the basic equipment. Petitioner's expert witness, Hugh A. MacMullan, III, of the Manufacturers' Appraisal Co. presented a report valuing the stock at $40.35 a share. He argued that it was unnecessary in his view to value this equipment at its fair market value because there were no earnings to support these values. He offered no explanation of why the actual market value of the equipment should not be used in determining the value of the stock based on the company's assets. Mr. MacMullan's valuation of the Oman Co. stock did not have a sufficient factual basis to be helpful. One of the disputes between the parties is whether the value of the Oman Co. stock as otherwise determined *116 should be discounted because of the loss to the company of decedent's services. It has been recognized that the loss of a manager of a "one-man" business may have a depressing effect upon stock value, [5] especially if no trained personnel are replacing the deceased manager. In our view, the key man discount is not a relevant factor in the case of Oman Co. since Jack Oman, decedent's son, had taken over the management of the company before his father's death and continued thereafter to manage the company. Although the Oman family sustained an enormous emotional loss upon decedent's death, the record does not support the conclusion that Oman Co. suffered an economic loss as a result of decedent's death. Petitioner argues that the company's joint venture participation tapered off as a result of decedent's death, but the facts in the record do not support this conclusion. Petitioner relies on Estate of Huntsman in support of the argument for a key-man discount. This reliance is unfounded. The parties in Hutsman agreed that a key-man discount should be applied in that case. No such agreement exists in the instant case. *117 This Court noted in Huntsman,66 T.C. at 879, that -- The decedent was the dominant force in both businesses, and his untimely death obviously reduced the value of the stock in the two corporations. However, both corporations had competent officers who were able to assume successfully the decedent's duties. Both experts agreed that some discount must be made to reflect the loss of the decedent. * * * [Emphasis added.] Here, decedent's sons were competently running Oman Co. prior to his death. Decedent had partially retired and was not the primary manager of Oman. Co. at the date of his death. Petitioner also relies on the valuation by Mr. Foster of Touche Ross & Co. of the Oman Co. stock. Mr. Foster valued the stock on behalf of the executor for the purpose of arriving at a value at which some of decedent's shares of the company might be sold back to the company to enable the estate to pay the estate tax. Petitioner argues that Mr. Foster's valuation should be given greater weight than others because Mr. Foster had no interest in assigning either a low or high value to the stock but was recommending a sale price that would be fair both to decedent's *118 daughters and sons. We do not agree with petitioner that we should lend credibility to Mr. Foster's valuation simply because it reflects the price decedent's children agreed should be paid to redeem the stock. This sale, in our view, does not represent an arm's - length transaction [6] and cannot be treated as indicative of that stock's fair market value. Forced sales of stock to family members to enable them to pay estate taxes are in no way reflective of fair market value because the sales occurred under unusual circumstances. [7] The same is true of sales of stock back to the company. The sales were not at arm's length or under normal conditions due to the inter-family relationship of the parties to the sales and the estate's need to acquire funds to pay taxes. Respondent contends that the forced and orderly liquidating values should be considered when valuing decedent's interest in Oman Co. Petitioner argues that the liquidating value approach offers *119 no meaningful insight into the value of the Oman Co. stock. Petitioner argues that where there is no reasonable prospect of liquidation, this approach is too speculative to be considered, citing Estate of Andrews v. Commissioner,79 T.C. 938, 942 (1982). Petitioner does add, however, that where liquidating value is considered, the costs of liquidation should also be considered. Charles E. Whiteside, an engineering group manager working for respondent, prepared a report valuing the construction equipment held by Oman Co. as of March 17, 1977. He rejected the valuation of Touche Ross of $5,633,968 as submitted with petitioner's tax return becase of the short useful life used in depreciating construction equipment, the accelerated depreciation methods, the equipment's high salvage value, the maintenance expenditures ($7,742,590 in last 6 years) and the high replacement costs which in his view indicated that book value was much lower than the fair market value of the assets. In his report, Mr. Whiteside used the method of valuation called the "replacement cost new less depreciated value." From the audited financial statements of Oman Co. prepared by Touche Ross for *120 the years 1972 through 1977, Mr. Whiteside made an estimate based on two different methods: one using the company's turnover study for additions and the other using the company's turnover study for retirement of its equipment. Under the turnover method, Mr. Whiteside determined from the additions how long it took the company to arrive at the total of the assets it had at the beginning of the 6-year period. Under the retirement method, Mr. Whiteside made a schedule estimating how long it would take the company to arrive at the total number of the assets it had at the beginning of the period based on its retirements. Mr. Whiteside applied a cost index of new equipment to arrive at the cost to Oman Co. to reproduce the different assets as of the date of decedent's death, then used a straight line depreciation method starting back from the first date used in the computation to arrive at a total which would approximate "replacement cost new less depreciated value." Under the turnover method of valuation, Mr. Whiteside determined the fair market value of Oman Co.'s equipment at decedent's date of death was $23,600,724. Under the retirement method, Mr. Whiteside estimated the fair market *121 value of such equipment was $22,585,791. Based on such method of valuation, in Mr. Whiteside's opinion, a reasonable estimate of the fair market value of the company's equipment was $22,500,000 as of March 17, 1977. We conclude that the method of appraisal of Marshall and Stevens of the Oman Co. stock produces the most accurate and reliable evidence of the value of this stock. The weighing of various factors in order to determine the value of closely held stock as was done by Marshall and Stevens has long been accepted by this Court. Estate of Andrews v. Commissioner,79 T.C. 938, 940-941 (1982); Estate of Leyman v. Commissioner,40 T.C. 100, 119 (1963), remanded on other grounds 344 F.2d 763 (6th Cir. 1965); section 20.2031-2(f), Estate Tax Regs. These factors used in valuing stock cannot be applied with mathematical precision but must be tailored to account for the particular facts of each case. See Messing v. Commissioner,48 T.C. 502, 512 (1967). We agree with the parties that it is appropriate in the instant case to decrease stock value for lack of marketability. It would be difficult to sell 75.6 percent *122 of the stock of Oman Co. to an outsider, particularly with decedent's sons remaining active in the business. The parties both argue for a discount for lack of marketability except that Marshall and Stevens counterbalance the effect of the discount by adding a premium for control which we agree is also justified. J. P. Foster used a discount of 25 percent for lack of marketability. The Manufacturers' Appraisal Co. netted out the discount for lack of marketability and the control premium and applied neither. Marshall and Stevens applied a 20 percent control premium and a 10 percent lack of marketability discount. Petitioner argues on brief for a control premium of 25 percent and a discount for lack of marketability of 20 percent. The control premium is justified in the instant case because the purchaser would be able not only to liquidate the company pursuant to Tennessee law but would also possess the ability to control the management and policies of the company. We accept the control premium of 20 percent as applied in the Marshall and Stevens report but conclude for reasons given by a number of other witnesses that the record justifies a 20 percent discount for lack of marketability *123 of the stock. We accept the valuation of Marshall and Stevens for the reasons herein discussed except that the discount for lack of marketability should be 20 percent rather than 10 percent.On this basis we conclude that the fair market value of the Oman Co. stock held by decedent at the date of his death was $72.42 per share and so hold. Settlement Agreement
Respondent contends that the agreement reached between petitioner and respondent's Appeals officer is not an enforceable settlement agreement because it was a tentative informal agreement which was neither executed by both parties, nor filed with the Court, nor orally stipulated into the record during the trial in this case. Respondent relies on Jones v. Commissioner,795 F.2d 566 (6th Cir. 1986), affg. a Memorandum Opinion of the Court. In Jones, we held that an agreement reached between an Appeals officer and a taxpayer's counsel but not approved or signed on behalf of respondent by his counsel was not enforceable in this Court. Petitioner contends that the agreement petitioner's counsel reached with the Appeals officer, valuing the Oman Co. stock at $49 a share, is binding on respondent even *124 though it was not executed on behalf of respondent by his counsel or filed with this Court. Petitioner contends that pursuant to Rev. Proc. 79-59, 1972-2 C.B. 573, and pursuant to 26 C.F.R. sec. 601.106 (1983), Statement of Procedural Rules, the Appeals officer had exclusive settlement jurisdiction of the stock valuation issue and the function of the District Counsel was simply to sign the decision document prepared by the Appeals officer and file it with this Court for signature by a judge of this Court. Petitioner argues that respondent is estopped to deny the enforceability of an agreement reached with the Appeals officer because the agreement complied with respondent's procedural rules which grant exclusive jurisdiction to settle the case to the Appeals officer and his superior. This Court has uniformly held that where a settlement stipulation has been filed or a partial settlement orally stipulated into the record, the parties' agreement will be enforced unless for reasons of justice one party or the other should be relieved from the stipulation. See Cataldo v. Commissioner,476 F.2d 628 (2d Cir. 1973), affg. a Memorandum *125 Opinion of this Court; Sennett v. Commissioner,69 T.C. 694 (1978); Saigh v. Commissioner,26 T.C. 171 (1956); Rule 91(e), Tax Court Rules of Practice and Procedure. We are, however, not faced with this situation in the instant case. The record shows merely preliminary negotiations which did not result in an agreed stipulation by respondent through the counsel representing him in this Court and was not agreed to by the Appeals officer after the independent appraisal firm of Marshall and Stevens valued the stock at $81.48 per share. There was no mutual mistake of material fact in this case as in Jones v. Commissioner,supra.However, the existence of a mutual mistake of material fact was only an alternative ground for the holding of both this Court and the Sixth Circuit in Jones. The primary holding was that the settlement was not binding until signed on behalf of respondent by his counsel or agreed to before the Court by counsel for the parties. In our view petitioner has misinterpreted the exclusive settlement jurisdiction of the Appeals Office referred to in the procedural rules. This jurisdiction was not intended to *126 prohibit the Appeals Office from seeking the advice of the District Counsel. Exclusive settlement jurisdiction refers to the Appeals Office's authority to settle a case without the participation in the settlement conferences of District Counsel. Where the Appeals Office does seek the advice of District Counsel, whose duty it is to resolve complex valuation questions for respondent, a settlement is not binding until approved on behalf of respondent by District Counsel. Jones v. Commissioner,supra.See also Gilliland v. Brooks,    F.Supp.    ( M.D. Tenn. 1986, 47 AFTR 2d 81-1364, 86-2 USTC par. 9758), holding that execution by District Counsel on behalf of respondent of a settlement document prepared by the Appeals Office is a discretionary act not subject to mandamus, relying on part on Jones v. Commissioner,supra.
We conclude that the agreement reached by petitioner's counsel and the Appeals officer is not a final settlement agreement enforceable in this Court since it was not signed by respondent's counsel on his behalf or stipulated into the record in this Court or otherwise agreed to by counsel before this Court. *127 Petitioner has made no showing to support the claim that respondent is estopped to deny the $49 value used in the proposed Appeals Office settlement, and we hold he is not estopped. Decision will be entered under Rule 155.
Footnotes
*. In accordance with changes made and explained in subsequent financial statements.↩
*. Valuation date - 3/18/77 The increase for control was computed as follows: Based on the data previously cited, we believe a control premium of 20% is warranted in this instance and will apply same utilizing a formula which assumes that 51% ownership of the stock represents control. Thus: 283,500 X 51%
=
144,585 shares
283,500 X 49%
=
138,915 shares
144,585(1.2X)
+
138,915X = $23,570,000
173,502X
+
138,915X = $23,570,000
312,417X = $23,570,000
X = $75.44
value of minority share
1.2X = $90.53
value of a controlling share
138,915 X $75.44
=
$10,479,748   value of minority interest
144,585 X $90.53
=
$13,089,290   Value of controlling interest
(difference due to rounding)
[1] 600 shares retired See Tenn. Code Ann. sec. 48-1-1002 (1984), which provides for voluntary dissolution of a corporation upon the affirmative vote of a majority of all of the outstanding shares entitled to vote or upon receiving 2/3 of the votes of the members present at a meeting called to dissolve a corporation.
[2]↩ 132,000 shares retired at $35 per share
3. see generally, F. Burke, Valuation and Valuation Planning for Closely Held Businesses, 33-39 (1981); see also, Rev. Rul. 59-60, 1959-1 C.B. 237↩.
4. The following chart reflects the percentage of equipment repairs to the total acquisition cost of the equipment: ↩
Unadjusted Basis
Shop Repair Cost
Percentage
3-31-73
$22,395,655 $1,133,888 5.063
3-31-74
24,057,492
1,453,322
6.041
3-31-75
25,009,495
1,355,201
5.419
3-31-76
26,508,293
1,215,044
4,583
3-31-77
25,948,738
1,140,919
4.397
3-31-78
27,958,203
1,471,354
5.262
3-31-79
28,471,223
2,160,196
7.587
3-31-80
27,705,823
2,248,774
8.116
3-31-81
27,327,693
2,148,701
7.862
5. Rev. Rul. 59-60, 1959-1 C.B. 237↩.
6. See Rev. Rul. 59-60, 1959-1 C.B. 237↩; F. Burke, Valuation and Valuation Planning for Closely Held Businesses, 44-45 (1981).
7. See Estate of Miller v. Commissioner,T.C. Memo. 1959-235↩.