T.C. Memo. 2000-129


UNITED STATES TAX COURT


ESTATE OF MARY D. MAGGOS, DECEASED, CATHERINE M. ADKINS,
SPECIAL ADMINISTRATOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20877-93.                    Filed April 11, 2000.


McGee Grigsby, Stanley Y. Mukai, R. John Seibert, Kimberly
Rae McCorkle, William C. McCorriston, Nathan Jerold Cohen,
Jeffrey W. Ferguson, Michael Rosenthal, and Julian Y. Kim, for
petitioner.

Henry E. O'Neill, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  Respondent determined a deficiency of
$2,229,350 in petitioner's Federal gift tax for 1987.  The issue

for decision is whether a transaction in which Mary D. Maggos' shares of stock in a family-owned company were redeemed constitutes a taxable gift by Mary D. Maggos for purposes of section 2512.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The original petition in this case was filed on behalf of Mary D. Maggos, who at the time resided in Honolulu, Hawaii. Mary D. Maggos (decedent) died on September 3, 1996, at the age of 89.

During 1987, Pepsi-Cola Alton Bottling, Inc. (PCAB), was an Illinois corporation engaged in the business of operating a Pepsi-Cola bottling franchise in southwestern Illinois (hereinafter the franchise). The franchise was initially acquired in 1936 by decedent's husband, Gust Maggos. The franchise was subsequently incorporated as PCAB. Until his death in June 1954, Gust Maggos supervised and directed the business affairs of PCAB on a day-to-day basis. During the course of their marriage, Gust and decedent had two children, Nikita Maggos and Catherine M. Adkins. Subsequent to Gust Maggos' death, Nikita Maggos assumed control of the business on a day-to-day

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

basis.  From the time PCAB was incorporated until May 1, 1987, decedent was a member of the board of directors of PCAB.

On July 28, 1960, all outstanding shares in PCAB were divided between decedent, who held 567 shares, and Nikita Maggos, who held 433 shares.  On July 29, 1960, decedent and Nikita Maggos entered into a written "Declaration of Trust", and decedent conveyed her 567 PCAB shares and certain real property located in Illinois into the trust.  As a consequence of decedent's conveyance of her shares to the trust, PCAB canceled stock certificates representing decedent's personal ownership of the 567 PCAB shares and issued new certificates for those shares to Nikita Maggos and decedent as cotrustees of the trust.

Under the written terms of the trust, decedent and Nikita Maggos were cotrustees and had the following rights and beneficial interests:  Decedent had a right to the net income of the trust during her life and had a limited power of appointment over the beneficial shares of the remainder interests among the named residual beneficiaries.  The corpus of the trust could be invaded for the care, comfort, medical attention, support, maintenance, or education of decedent, at the discretion of the trustees.  Unless the trust was amended, Nikita Maggos, if he survived decedent, was entitled to the corpus of the trust upon decedent's death.  As cotrustees, decedent and Nikita Maggos could jointly, in their sole discretion, revoke or amend the

terms of the trust. The trustees had the power to vote any stock or other voting securities held in the trust. In case of death, resignation, refusal, removal, or inability to act of either of the trustees, the remaining trustee was to act as sole trustee.

Redemption Transaction

In 1987, after discussions between decedent and Nikita Maggos, attorneys for Nikita Maggos and PCAB prepared documents which effected the transaction at issue in this case. All documents that were prepared to effect the transaction were executed together as part of an integrated transaction. Pursuant to the above-mentioned documents, Nikita Maggos and decedent, as cotrustees, transferred 567 PCAB shares from the trust to decedent (in her individual capacity) on May 1, 1987. PCAB then redeemed the 567 PCAB shares from decedent. Decedent received the redemption price from PCAB in the form of a promissory note with a $3 million face amount and a 10-year maturity. The note provided for interest to be paid annually at a rate of 8 percent per annum and principal to be repaid in a single balloon payment at maturity. As a result of the redemption transaction, Nikita Maggos became the sole owner of PCAB.[2]

---

[2]The redemption was subject to a pledge agreement that acted as a security for the performance of the promissory note.

Decedent was represented by independent and experienced counsel in the transaction.[3] The redemption transaction was designed to be an "estate freeze". The purpose of an estate freeze, to minimize estate taxes, was explained to decedent by her counsel before the redemption. The redemption price of $3 million was determined in part because Nikita Maggos' attorney believed they could support such a valuation for gift tax purposes.[4] In part, the price was determined by the amount Nikita Maggos thought he could afford. Decedent and Nikita Maggos did not negotiate the redemption price. Neither Nikita Maggos nor decedent sought a formal valuation of the company prior to the redemption. However, in January 1987, Nikita Maggos' accountants wrote to Robert T. Shircliff & Associates, Inc. (Shircliff & Associates), requesting that Shircliff & Associates review the draft financial results of PCAB to October 31, 1986, so that they could advise Nikita on the value of PCAB. The purpose of obtaining the valuation was for estate planning. Shircliff & Associates were in the business of consulting with Pepsi bottlers and acting as business brokers in the purchase and sale of Pepsi bottling franchises. Shircliff & Associates prepared a preliminary valuation of PCAB's business based in part

[3]Decedent's attorney was Robert Hite.

[4]Nikita Maggos' attorney was Victor Bezman, a partner in the firm of Katten Muchin & Zavis.

on a complete valuation of the business that Shircliff &
Associates had conducted in 1983 and on the recent draft
financial information that had been provided.  Shircliff &
Associates formed the view that the business as a whole could be
sold for between $9,764,144 and $13,169,366.[5]

Pleadings

The initial petition alleges in relevant part:

The Commissioner erred by determining that <u>the common
stock of Pepsi-Cola Alton Bottling, Inc. owned by the
Petitioner</u> had a fair market value of $8,056,000.00 as
of May 1, 1987.  [Emphasis added.]

Petitioner's amended petition alleges:

4.  The determination of gift tax set forth in the
Notice of Deficiency is based of the following errors:
    (a)  The Respondent erred by determining that
a deficiency in gift tax of $2,229,350 is due from the
Petitioner for the year ended December 31, 1987.
    (b)  The Respondent erred by determining an
increase of $5,056,000 in taxable gifts.
    (c)  The Respondent erred by determining that
the total amount of taxable gifts is $5,057,000.
    (d)  The Respondent erred by determining the
tax on total taxable gifts is $2,422,150.
    (e)  The Respondent erred by determining that
the redemption of the <u>Petitioner's stock</u> of Pepsi-Cola
Alton Bottling, Inc. ("PCAB") was a gift since the
redemption was fraudulently induced and resulted in
Petitioner being swindled out of the full value of her
PCAB stock.
    (f)  The Respondent erred by determining that
the redemption of the <u>Petitioner's PCAB stock</u> was a
gift since the redemption constituted a bona fide,
arms-length transaction which proved to be a bad
bargain for the Petitioner.

---

[5]This was based on a range of values between $5.19 and $7
per case times 1,881,338 cases sold.  The valuation worksheet
also shows a total valuation of $10,061,000.

(g)   The Respondent erred in treating the redemption of the <u>stock of PCAB owned by the Petitioner</u> as a gift since the redemption was free of donative intent.

(h)   The Respondent erred by determining that the redemption of the Petitioner's PCAB stock was a gift since the fraudulent inducement described in subparagraph (e) constituted a theft of the <u>Petitioner's PCAB stock</u>.

(i)   The Respondent erred by determining that the <u>stock of PCAB owned by the Petitioner</u> had a fair market value of $8,056,000 as of May 1, 1987.

(j)   The Respondent erred by determining that the transfer of the <u>stock of PCAB owned by the Petitioner</u> was for less than adequate and full consideration.

(k)   The Respondent erred by determining that the Petitioner made a gift of $5,056,000 to Nick Maggos.

5.   The facts upon which the Petitioner relies as a basis of her case are as follows:

\*     \*     \*     \*     \*     \*     \*

(b)   At all relevant times herein prior to May of 1987, the <u>Petitioner was the owner and/or beneficial owner of approximately 56.7% of the stock of PCAB</u>, while Nick Maggos ("Nick"), the Petitioner's only son, was the owner and/or beneficial owner of all of the remaining issued and outstanding stock of PCAB. [Emphasis added.]

Respondent's answer to the amended petition admitted

paragraph 5(b) of petitioner's amended petition.

<u>Pretrial Order of July 15, 1997</u>

The Court issued the following pretrial order:

For cause, it is

ORDERED that each of the parties shall file no later than September 15, 1997, a memorandum setting forth--

(1) (a)  The issues of fact (including any issues subsidiary to ultimate issues) and (b) the issues of law (including any issues subsidiary to

ultimate issues) to be resolved by the Court. Such issues should be set forth in sufficient detail to enable the Court to decide the case in its entirety by addressing each of the issues listed.

(2) A clear, complete, and concise exposition of each party's position and the theory underlying that position with respect to each of the issues that are set forth pursuant to (1) above. In this regard each party shall include a statement in narrative form of what each party expects to prove.

It is further

ORDERED that the statement of issues set forth pursuant to (1) above shall control the admissibility of evidence at trial and evidence offered at trial will [be] deemed irrelevant unless it pertains to one or more of the issues set forth pursuant to (1) above. It is further

ORDERED that neither party will be allowed to advance a position or theory underlying that position with respect to any of the issues set forth pursuant to (1) above that is different from the positions or theories set forth pursuant to (2) above. [Emphasis added.]

## Petitioner's Amended Memorandum of Issues

Petitioner's memorandum filed in response to the Court's

order states the following factual basis for asserting petitioner

is not liable for the gift tax assessed:

The redemption transaction does not constitute a taxable gift because the transaction was the result of a theft procured by fraud. Petitioner intends to prove: (1) a lack of donative intent on the part of Petitioner; (2) actual and/or constructive fraud on the part of Nikita; and alternatively (3) the redemption was a bad business bargain; and in the further alternative, (4) the value of the stock on the date of the redemption ($3 million) was equal to fair market value.

As issues of law, petitioner states:

1.  <u>Theft</u>.
The redemption constituted a theft under state law.
* * *

2.  <u>Fraud</u>.
No gift was made because Petitioner was swindled. * * *

3.  <u>Mistake</u>.
Under Hawaii law, a party to a contract may rescind a contract on the basis of unilateral mistake. * * *

4.  <u>Bad Business Bargain</u>.
A transaction entered into in the ordinary course of business will be considered as made for full and adequate consideration in money or money's worth. * * * Since the redemption was entered into in the ordinary course, there was no gift.  Moreover, the fact that a familial relationship existed between Petitioner and the buyer does not preclude the defense of a bad business bargain.  [Citations Omitted.]

Petitioner's memorandum concludes:

> Petitioner intends to prove that the redemption was a theft procured by fraud, that she lacked donative intent and the transaction must be rescinded on the basis of mistake.  Alternatively, the redemption was a bad business bargain.  As a further alternative theory, Petitioner will prove that the fair market value of the stock was $3 million on the date of redemption.  Under either theory, no gift tax is owed.

<u>Respondent's Memorandum of Issues</u>

Respondent's memorandum sets out the following issues of fact:

> 1.  Whether the redemption of Petitioner's 56.7% interest in Pepsi-Cola Alton Bottling, Inc. (PCAB) on May 1, 1987, for $3,000,000, payable by way of a 10-year promissory note (providing for monthly payments of interest only at 8% for the entire 10-year term) constituted a taxable gift to her son, Nikita Maggos (Nikita), the owner of the remaining 43.3% of PCAB.
>
>> A.  Whether the redemption of Petitioner's PCAB stock at a stated redemption

price of $3,000,000 constituted a sale in the
ordinary course of business (a transaction that
was bona fide, at arm's length, and free from any
donative intent) within the meaning of Treas. Reg.
§ 25.2512-8.

B.   Whether Nikita, E. Lawrence
Helm, CPA (Helm) and Victor Bezman, Esq.
(Bezman) engaged in a conspiracy to defraud
Petitioner in connection with the redemption
of her PCAB stock.

C.   Whether the redemption of
Petitioner's PCAB stock at a stated
redemption price of $3,000,000 constituted a
bad business bargain by Petitioner,
irrespective of whether she was defrauded by
Nikita, Helm and/or Bezman.

2.   Whether the fair market value of Petitioner's
56.7% interest in PCAB as of May 1, 1987, was
$3,000,000 (the stated redemption price), or was
$8,056,000 as determined by Respondent.

<u>Civil Litigation</u>

In 1994, after receiving advice from her daughter, Catherine
Adkins, decedent ceased her association with Robert Hite, her
attorney of many years, and retained new counsel.

Subsequent to retaining new counsel on May 31, 1994,
decedent disinherited her son, Nikita Maggos.  Based on advice
from new counsel, on August 23, 1994, decedent commenced suit in
the U.S. District Court for the District of Hawaii against Nikita
Maggos and PCAB (Civil No. 94-00649ACK) (the District Court
litigation).  On August 17, 1995, decedent commenced suit in the
Circuit Court of the First Circuit of Hawaii against Helm, Huber,

Ring, Helm & Co.,[6] Bezman, and Katten Muchin & Zavis (Civ. No. 95-2973-08). The circuit court litigation was removed to the Federal District Court in Hawaii (Civil No. 95-00784 SPK) and was ultimately consolidated with the District Court litigation. In the District Court litigation, decedent sought both damages and the rescission of the redemption transaction based on a number of claims asserted against Nikita Maggos and PCAB, including common law fraud, breach of fiduciary duty (against Nikita in his capacity as a fiduciary being the president and a director of PCAB and the decedent's son), and breach of the Illinois Business Corporation Act. Decedent also asserted similar claims, as well as professional malpractice claims, against Helm, Huber, Ring, Helm & Co. (her former accountants), Bezman, and Katten Muchin & Zavis (Nikita's, and PCAB's attorneys)

Petitioner's attorneys requested Coopers & Lybrand to determine the fair market value of a 100-percent and a 56.7-percent interest in PCAB. Coopers and Lybrand prepared an expert report for the District Court litigation in support of petitioner's contention that decedent had been defrauded by Nikita Maggos. Coopers & Lybrand concluded that on May 1, 1987, a 100-percent interest in PCAB was worth between $14 million and $18 million and a 56.7-percent interest was worth between $7,144,200 and $9,185,400. That study determined that the

---

[6]The accountants whom Nikita Maggos and PCAB employed.

appropriate "marketability discount" that should be applied to the value of a 56.7-percent interest was 10 percent. Petitioner filed the Coopers & Lybrand report in the District Court litigation on or about December 10, 1996, in support of decedent's assertion that her interest in PCAB was worth substantially in excess of what she received in the May 1, 1987, redemption. The District Court litigation was settled out of court in early 1998.[7]

OPINION

In May 1987, decedent and PCAB entered into a redemption transaction designed to minimize decedent's estate and gift taxes and to achieve decedent's other testamentary goals. The evidence supporting this conclusion is explained more fully later in this opinion.

Respondent contends that PCAB redeemed decedent's shares in PCAB for less than their fair market value, resulting in Nikita Maggos' owning 100 percent of PCAB. Respondent argues that this transaction resulted in a gift to decedent's son Nikita Maggos that is subject to gift tax. Respondent's measure of the gift is

---

[7]Pursuant to the terms of the settlement, Nikita Maggos paid $1,400,000 and conveyed an apartment in Honolulu, Hawaii, to the Estate of Mary Maggos, and the Estate obtained a release from the counterclaims asserted by Nikita Maggos. Petitioner also obtained an indemnity from Nikita Maggos for any gift tax liability that might be due as a result of the May 1, 1987, redemption.

the alleged difference between the fair market value of decedent's stock and the redemption price.

Section 2501(a) provides for a tax on gifts by individuals. Section 2512(a) provides that the value of a gift of property at the date of the gift shall be considered the amount of the gift. Section 2512(b) provides:

> SEC. 2512(b). Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

If the value of the property given up by decedent exceeded the value of the property she received, decedent made a gift for the purposes of the Federal gift tax. The amount of any such excess augmented the value of Nikita Maggos' common stock in PCAB and would be a taxable gift from decedent to Nikita. See Kincaid v. United States, 682 F.2d 1220, 1224 (5th Cir. 1982); Tilton v. Commissioner, 88 T.C. 590 (1987); sec. 25.2511-1(h)(1), Gift Tax Regs.[8]

---

[8]Sec. 25.2511-1(h)(1), Gift Tax Regs., provides:

(h) The following are examples of transactions resulting in taxable gifts and in each case it is assumed that the transfers were not made for an adequate and full consideration in money or money's worth:

(1) A transfer of property by a corporation to B is a gift to B from the stockholders of the

(continued...)

Petitioner argues in the alternative:  Decedent did not own the 567 shares that were redeemed in 1987 (ownership argument); the redemption transaction was not a completed gift in 1987 because a breach of fiduciary duty owed to decedent occurred or decedent was defrauded and either or both events would entitle decedent to rescind the transaction (incomplete gift argument); and, finally, the redemption price was either full and adequate consideration for decedent's interest in the 567 shares or alternatively was a bad business bargain.

Respondent argues that petitioner should be precluded from raising or relying on the argument that decedent was not the full beneficial owner of the redeemed stock.

Petitioner's counsel on brief now asserts:

> Respondent's argument rests on the erroneous belief that the 567 PCAB shares redeemed in 1987 were owned by Mary Maggos.  They were not.  Mary Maggos neither owned these 567 PCAB shares nor had power to exercise control over the stock consistent with ownership.  Rather, the

---

[8](...continued)
corporation. If B himself is a stockholder, the transfer is a gift to him from the other stockholders but only to the extent it exceeds B's own interest in such amount as a shareholder. A transfer of property by B to a corporation generally represents gifts by B to the other individual shareholders of the corporation to the extent of their proportionate interests in the corporation. However, there may be an exception to this rule, such as a transfer made by an individual to a charitable, public, political or similar organization which may constitute a gift to the organization as a single entity, depending upon the facts and circumstances in the particular case.  [Emphasis added.]

Trust owned the 567 PCAB shares, and Mary Maggos merely had a life estate interest in the income of the Trust corpus.

Respondent, with a great deal of justification, asks this Court to preclude petitioner from arguing that decedent had only a limited interest in the redeemed PCAB shares. Respondent argues that this is a new issue that petitioner is improperly raising for the first time on brief, and the Court should apply the doctrine of judicial estoppel[9] to prevent petitioner's taking a position on the "ownership" of the PCAB shares that is inconsistent with petitioner's position in the District Court litigation.

Petitioner's argument that decedent had less than a full beneficial ownership interest in the 567 shares of PCAB common stock is not mentioned in the petition, amended petition, memorandum filed in response to our pretrial order of July 15, 1997, or petitioner's pretrial memorandum that was submitted just prior to trial. In fact, petitioner's pleadings and the pretrial memorandum assert that decedent was "owner and/or beneficial owner" of the PCAB shares. Petitioner took the same position in the District Court litigation. We have no doubt that

---

[9]The doctrine of judicial estoppel is also known as the doctrine of preclusion of inconsistent positions. See Helfand v. Gerson, 105 F.3d 530, 534 (9th Cir. 1997). In this opinion, for convenience, we adopt the term "judicial estoppel" when referring to the doctrine.

petitioner's counsel were aware that the pleadings and the pretrial memorandum in this case and the District Court litigation were totally inconsistent with petitioner's present argument that decedent had no ownership interest in the PCAB shares. We also have no doubt that had petitioner amended the pleadings in this case in order to take such a position, it would have been prejudicial and possibly fatal to petitioner's District Court litigation.

We agree with respondent that petitioner first asserts the ownership argument on brief.[10] While this Court is seldom inclined to consider an argument raised for the first time on brief, there is no absolute rule barring such consideration. As we said in Ware v. Commissioner, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62 (2d Cir. 1990):

> The rule that a party may not raise a new issue on brief is not absolute. Rather, it is founded upon the exercise of judicial discretion in determining whether considerations of surprise and prejudice require that a party be protected from having to face a belated confrontation which precludes or limits that party's opportunity to present pertinent evidence. * * * [Citations omitted.]

Every representation by petitioner, until the opening brief was filed, had been that decedent was the owner or beneficial owner of the redeemed shares. The Court's pretrial order of July 15,

---

[10]We do not agree that petitioner's "incomplete gift argument", which is based on alternative grounds of fraud, theft, and mistake, is a new argument raised for the first time on brief.

- 17 -

1997, required that each of the parties file a memorandum setting forth:

> (1) (a)  The issues of fact (including any issues subsidiary to ultimate issues) and (b) the issues of law (including any issues subsidiary to ultimate issues) to be resolved by the Court. * * *
>
> (2)  A clear, complete, and concise exposition of each party's position and the theory underlying that position with respect to each of the issues that are set forth pursuant to (1) above. * * *

The order further stated:

> ORDERED that neither party will be allowed to advance a position or theory underlying that position with respect to any of the issues set forth pursuant to (1) above that is different from the positions or theories set forth pursuant to (2) above.  [Emphasis added.]

Petitioner's memorandum in response to our order lists theft, fraud, mistake, and bad business bargain as the issues to be tried.[11]  Petitioner's counsel do not offer any justification for their apparent disregard of the pretrial order.  Respondent would be prejudiced if we were to allow petitioner, contrary to our previous order, to disclaim full beneficial ownership of the redeemed shares for the first time on posttrial brief.[12]  For

---

[11]The Court's order is set out in full supra pp. 7-8, and the relevant portions of petitioner's amended memorandum of issues are set out supra pp. 8-9.

[12]In addition to petitioner's pleadings and the representation to the Court that decedent owned full beneficial interest in 567 shares of PCAB, both decedent and her son treated the stock as if it were decedent's by having the trust transfer the shares to her prior to the redemption.

this reason, we refuse to allow petitioner to assert that decedent had less than the full beneficial ownership of the redeemed shares.

The doctrine of judicial estoppel also supports our refusal to allow petitioner to raise the issue of decedent's ownership in the redeemed stock.  While the contours of the doctrine of judicial estoppel are not yet fully settled,[13] we have held that the doctrine of judicial estoppel is available in the Tax Court. See Huddleston v. Commissioner, 100 T.C. 17 (1993).

In Helfand v. Gerson, 105 F.3d 530, 534 (9th Cir. 1997), the Court of Appeals for the Ninth Circuit summarized the doctrine, stating:

> "Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." Rissetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996).  It is an equitable doctrine intended to protect the integrity of the judicial process by preventing a litigant from "playing fast and loose with the courts." Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.1990), (quoting Rockwell Int'l Corp. v. Hanford Atomic Metal Trades Council, 851 F.2d 1208, 1210 (9th Cir.1988)),

---

[13]    The doctrine of judicial estoppel is a vintage doctrine whose popularity varies from court to court nearly as greatly as its contours do.  And yet, it is gaining renewed currency.  The Ninth Circuit Court of Appeals is one of the courts to have infused it with renewed life and vigor.  That court applied judicial estoppel most recently to an estate planning case in Hawaii. * * *  [Sumner v. Michelin N. Am., Inc., 966 F. Supp. 1567, 1571 (M.D. Ala. 1997) (referring to Helfand v. Gerson, 105 F.3d 530 (9th Cir. 1997)).]

cert. denied, 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991) (internal quotation marks omitted). "[F]ederal law governs the application of judicial estoppel in federal court." Rissetto, 94 F.3d at 603.

The Courts of Appeals are divided into what has been described by the Court of Appeals for the Ninth Circuit as the majority and minority positions.[14]  See Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597 (9th Cir. 1996).  In Yanez v. United States, 989 F.2d 323, 326 (9th Cir. 1993) (quoting Morris v. California, 966 F.2d 448, 452-453 (9th Cir. 1992)), the court characterized the positions, stating:

> "The majority of circuits recognizing the doctrine hold that it is inapplicable unless the inconsistent statement was actually adopted by the court in the earlier litigation * * *  The minority view, in contrast, holds that the doctrine applies even if the litigant was unsuccessful in asserting the inconsistent position, if by his change of position he is playing 'fast and loose' with the court....  In either case, the purpose of the doctrine is to protect the integrity of the judicial process. * * *"

This case is appealable to the Court of Appeals for the Ninth Circuit; as a consequence, we apply the doctrine as enunciated by the Court of Appeals for the Ninth Circuit.

---

[14]The Court of Appeals for the Tenth Circuit has firmly established that it will not be bound by the doctrine of judicial estoppel.  See Rascon v. U.S.W. Communications, Inc., 143 F.3d 1324 (10th Cir. 1998); see also the position of the Court of Appeals for the District of Columbia Circuit expressed in United Mine Workers of Am. 1974 Pension v. Pittston Co., 984 F.2d 469, 477 (D.C. Cir. 1993) (noting that this circuit has "not previously embraced" judicial estoppel).

In <u>Rissetto v. Plumbers & Steamfitters Local 343</u>, <u>supra</u> at 601, the court stated: "This Circuit has not yet had occasion to decide whether to follow the 'majority' view or the 'minority' view." (Fn. ref. omitted.) In that case, like the instant case, it was unnecessary to decide which view is correct. The court in <u>Rissetto</u> had to consider whether the obtaining of a favorable settlement in the earlier proceeding would be sufficient to satisfy the "majority view" requirement that the inconsistent statement was actually adopted by the court in the earlier litigation. The court stated:

> <u>We are thus confronted with the question whether obtaining a favorable settlement is equivalent to winning a judgment for purposes of applying judicial estoppel. We answer in the affirmative</u>. In our view, the fact that plaintiff prevailed by obtaining a favorable settlement rather than a judgment should have no more relevance than in the context of civil rights attorney's fees awards, <u>i.e.</u>, none whatever. <u>See</u> <u>Maher v. Gagne</u>, 448 U.S. 122, 100 S.Ct. 2570 * * * (1980) (party who obtains consent decree is "prevailing party" no less than one who obtains a judgment on the merits). [<u>Id.</u> at 604-605; fn. ref. omitted; emphasis added.]

Petitioner obtained a substantial settlement of the District Court litigation on the basis of the factual assertion that decedent was entitled to the legal or beneficial <u>ownership</u> of 56.7 percent of the issued and outstanding capital of PCAB. In the District Court litigation, decedent had asserted a value of her interest on the basis of full ownership rights. Petitioner's expert report filed in the District Court litigation valued her interest in PCAB at the time of the 1987 redemption between

$7,144,200 and $9,185,400.  Petitioner's counsel on brief now assert contrary positions.  Petitioner argues the value of decedent's beneficial interest is less than $3 million, and decedent had less than a full beneficial ownership.

In Helfand v. Gerson, supra at 535-536, the Court of Appeals for the Ninth Circuit recently stated:

> The integrity of the judicial process is threatened when a litigant is permitted to gain an advantage by the manipulative assertion of inconsistent positions, factual or legal.
>
> *     *     *     *     *     *     *
>
>  Judicial estoppel seeks to prevent the deliberate manipulation of the courts * * *

Petitioner's assertion of both full ownership of the PCAB shares and a value for the shares in excess of the consideration received by decedent was essential in order for petitioner to succeed in the District Court litigation.  Petitioner's new position on brief in the case before us is inconsistent with the position taken in the District Court.

We cannot in good conscience allow petitioner to benefit from having claimed full beneficial ownership in one court and then to come to this Court and make an inconsistent argument in an attempt to avoid the incidence of gift tax.  If petitioner received full value for what decedent owned and gave up, decedent cannot have been entitled to any recovery in the District Court litigation.  Petitioner is allowed to have it only one way.

While petitioner may make arguments in the alternative in a single litigation, it is not allowed to succeed twice in different suits on inconsistent factual and legal assertions. We hold that petitioner's conduct gives rise to circumstances that demand the application of the doctrine of judicial estoppel. We therefore hold that petitioner is estopped from asserting: (1) Decedent had less than a full beneficial interest in the PCAB shares at the time of the redemption, and (2) the shares had a value that was equal to or less than $3 million.[15]

Petitioner next argues that the redemption transaction was not a completed gift in 1987 because a breach of fiduciary duty owed to the decedent occurred and/or because decedent was defrauded. Petitioner argues that either or both events entitle decedent to rescind the transaction. We disagree.

In May 1987, decedent and her son, Nikita Maggos, entered into a transaction designed to minimize estate taxes and achieve decedent's testamentary goals. Both decedent and Nikita Maggos were represented by independent and qualified attorneys in the transaction. Nikita was represented by Mr. Bezman. Decedent's attorney at the time of the redemption transaction was Robert Hite. We found Mr. Hite to be a credible, truthful, and

---

[15]Petitioner filed a motion for summary judgment in this Court claiming "that the record shows clearly that Ms. Maggos [decedent] was defrauded because she transferred her PCAB shares for less than adequate consideration". Estate of Maggos v. Commissioner, T.C. Memo. 1997-431.

disinterested witness.  Mr. Hite testified that the purpose of the transaction was an "estate freeze", a legitimate estate planning technique to move an appreciating asset out of decedent's estate.[16]  He further testified that Nikita Maggos' attorney, Victor Brezman, had planned the transaction.  Mr. Hite did not question the redemption price that decedent and her son, Nikita Maggos, had agreed upon because it satisfied decedent's

---

[16]Mr. Hite testified:
> Q    And do you know who planned this transaction?
> A    It was Mr. Bezman.
> Q    And did anyone describe the reasons for the transaction?
> A    Right; he explained that the value of this Pepsi-Cola bottling company was going up, and that they wanted to  stop the value from going up any higher in Mrs. Maggos' estate, so they wanted to freeze it at the present value.
> Q    They wanted to freeze it at the present value?
> A    Right.
> Q    Does a transaction--in the jargon of your trade, does the--this transaction have a name?
> A    Well, it's an estate freeze, is what it is, yes.
> Q    And were you aware of a concept of an estate freeze prior to this meeting?
> A    Yes, of course.
> Q    Did you have any personal reservations about the legitimacy of an estate freeze?
> A    No; it's a perfectly legitimate legal transaction.
> Q    Are there any parameters in which the transaction should fall?
> A    Well, when you say, "Freeze it at present value," obviously the price the transaction is being placed at should be the fair market value of the property, the present fair market value of the property.
> Q    Uh-huh.  Was this meeting that occurred in your office a negotiating session?
> A    No, it wasn't.  It was--they came in, they said that they had reached this agreement with Mrs. Maggos, and that she was going to redeem her stock at the $3 million figure.

testamentary plan.[17]  Mr. Hite testified that decedent "had promised to leave him [Nikita Maggos] the shares when she died."[18]  The conclusion that the redemption transaction was part of an estate plan is corroborated by the fact that as part of the redemption transaction plan, Nikita Maggos' and PCAB's attorneys

---

[17]Mr. Hite testified:

> Q    And did Mrs. Maggos ever ask you to negotiate with anyone --
> A    No.
> Q    -- about the price?
> A    No.  She said, "This is what we want to do; this is what we're going to do."
> Q    Did you have an understanding of why she did not ask you to negotiate?
> A    Well, she was--I knew of the relationship with her son, and that she was eventually going to give him this stock upon her death, and she and he had worked out a price that she was satisfied with, and I just felt that I wasn't being asked to question what they had already determined, and I was just to protect her interests, in making sure she got what she had bargained for.
> Q    So you thought she had negotiated the price before she got there?
> A    I did.
> Q    Was Mrs. Maggos present during all of your discussions with Mr. Helm and Mr. Bezman?
> A    She was.
> Q    Did she ask any questions?
> A    Not that I recall.  I remember explaining to her that this -- this idea of a freeze was a legitimate transaction, and that it would stop the value of her asset from going any higher, and that the current -- it would remain at the current value that it -- that they placed on it.
> Q    Did Mrs. Maggos seem pleased with the price?
> A    She did.

[18]Mr. Hite testified:

> Q.   Okay.  And this redemption was part of--came to be a central part of Mary's overall estate plan?
> A.   That's correct.

contacted decedent's attorney and recommended that decedent should be convinced to make a gift to decedent's daughter in 1987 so that the statute of limitations for assessing gift tax would start to run. We find that decedent and her son entered into the redemption transaction to fulfill decedent's estate planning goals and for no other reasons. Decedent was not concerned with and did not negotiate or authorize her attorney to negotiate for the fair market value of her interest in PCAB. The price received was the price that satisfied decedent's needs while she was alive, was the greatest amount her son believed he could pay, and was the lowest price Nikita's lawyers thought could be defended for gift tax purposes. So long as the transaction could be defended for Federal gift tax purposes, the fair market value of the PCAB shares that were redeemed was not of material concern to decedent.

We further find that decedent, after having received competent independent legal advice, gave a fully informed consent to the redemption transaction as an estate planning technique. On the record before us, given the intended nature of the redemption transaction, we can find no credible evidence that would support a finding that decedent was defrauded of her interest in PCAB or that there was any breach of fiduciary duty by Nikita Maggos which was owed to decedent, thus entitling decedent to rescind the transaction. We therefore reject

petitioner's "incomplete gift argument", and for the same reasons, we also reject petitioner's "bad business bargain" or "unilateral mistake" arguments.

Valuation

Valuation is a question of fact, and the trier of fact must weigh all relevant evidence to draw the appropriate inferences. See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938).

Fair market value is defined for Federal estate and gift tax purposes as the price that a willing buyer would pay a willing seller, both having reasonable knowledge of all the relevant facts and neither being under compulsion to buy or to sell. See United States v. Cartwright, 411 U.S. 546, 551 (1973) (citing sec. 20.2031-1(b), Estate Tax Regs.); see also Snyder v. Commissioner, 93 T.C. 529, 539 (1989). The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer. See Estate of Curry v. United States, 706 F.2d 1424, 1428-1429, 1431 (7th Cir. 1983); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); see also

Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595. The hypothetical willing buyer and willing seller are presumed to be dedicated to achieving the maximum economic advantage. See Estate of Curry v. United States, supra at 1428; Estate of Newhouse v. Commissioner, supra at 218. This advantage must be achieved in the context of market and economic conditions at the valuation date. See Estate of Newhouse v. Commissioner, supra at 218.

For Federal gift tax purposes, the fair market value of the subject property is determined as of the date of the gift. Ordinarily, no consideration will be given to any subsequent event that may have affected the value of the subject property on some later date if the event was unforeseeable at the time of the gift. See sec. 2512(a); sec. 20.2031-1(b), Estate Tax Regs.; see also First Natl. Bank v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985); Estate of Newhouse v. Commissioner, supra at 218; Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987).

Expert Testimony

Both parties rely primarily on expert opinion evidence to support their contrary valuation positions. We evaluate the opinions of experts in light of the demonstrated qualifications of each expert and all other evidence in the record. See Anderson v. Commissioner, 250 F.2d 242 (5th Cir. 1957), affg. in part and remanding in part on another ground T.C. Memo. 1956-178;

Parker v. Commissioner, 86 T.C. 547, 561 (1986). We have broad discretion to evaluate the overall cogency of each expert's analysis. See Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988), affg. in part and reversing in part T.C. Memo. 1986-318. We are not bound by the formulas and opinions proffered by an expert witness and will accept or reject expert testimony in the exercise of sound judgment. See Helvering v. National Grocery Co., supra at 295; Anderson v. Commissioner, supra at 249. We may reach a determination of value based on our own examination of the evidence in the record. See Lukens v. Commissioner, 945 F.2d 92, 96 (5th Cir. 1991) (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285). Where experts offer divergent estimates of fair market value, we decide what weight to give these estimates by examining the factors they used in arriving at their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We have broad discretion in selecting valuation methods. See Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191. Moreover, while we may accept the opinion of an expert in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C 441, 452 (1980), we may be selective in the use of any part of such opinion, or reject the opinion in its entirety, see Parker v. Commissioner, supra at 561. Finally,

because valuation necessarily results in an approximation, the figure at which this Court arrives need not be one as to which there is specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence.  See Silverman v. Commissioner, supra at 933; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962).

Respondent's Expert

Respondent employed the services of Business Valuation Services, Inc. (BVS), to value 567 shares of the common stock of PCAB as of May 1, 1987.  David N. Fuller, a principal of BVS, gave testimony at the trial.  Mr. Fuller has an M.B.A. degree in finance from Southern Methodist University, and is an accredited senior appraiser as designated by the American Socy. of Appraisers and a Chartered Financial Analyst.

The BVS report concluded that the fair market value of 567 shares of the common stock of PCAB on May 1, 1987, was $7,938,000.  This conclusion is based on 100 percent of the common stock of PCAB having a value of $14 million.  To arrive at this conclusion, BVS prepared several separate analyses.  BVS prepared a discounted cash-flow, a guideline company, a market transaction, and an acquisition analysis.  Each is discussed below.

Discounted Cash-Flow Analysis

In the discounted cash-flow (DCF) analysis, the present value of a company's projected annual cash-flows over the forecast period is added to the present value of a company's residual value and the value of a company's nonoperating assets to arrive at the present value of a company. A DCF analysis contains an inherent difficulty when used for a company that has a significant residual value because to determine the present value of a company, the DCF analysis requires an estimate of what a company will be worth at the end of the forecast period (residual value). PCAB's estimated residual value was neither minimal nor easily calculated. The BVS report assumes that in 10 years PCAB will be worth 12.5 times net earnings.

In closely held small companies, the use of a DCF analysis is also suspect when the discount rate is calculated by a weighted average cost of capital (WACC) determination. Such determinations often include a determination of the cost of capital using the "capital asset pricing model" (CAPM). This Court has recently observed:

> We do not believe that CAPM and WACC are the proper analytical tools to value a small, closely held corporation with little possibility of going public. CAPM is a financial model intended to explain the behavior of publicly traded securities that has been subjected to empirical validation using only historical data of the two largest U.S. stock markets. * * * [Furman v. Commissioner, T.C. Memo. 1998-157.]

The BVS report uses a WACC determination including a CAPM determination in arriving at an appropriate discount rate.  In making the CAPM determination, BVS assigned a beta[19] of 0.76 as compared to the market's normal rate of 1.0.  This resulted in a determination of the cost of equity capital being 14.2 percent in the CAPM computation.  We are not persuaded that the guideline companies used in the BVS report to determine beta in this case were appropriate.  None of the companies selected were shown to have had operations that were substantially similar to PCAB.  Nor are we persuaded that PCAB should be assigned a smaller beta than the guideline companies assuming that they were appropriate.  If a beta of 1.0 were assigned, volatility equal to market, the cost of equity capital would have been 16 percent rather than the 14.2 percent used in the BVS study.  We are also unpersuaded that the BVS study selected an appropriate rate for debt in the WACC determination.  BVS selected 10.5 percent as the pretax cost of

_____

[19]Beta, a measure of systematic risk, is a function of the relationship between the return on an individual security and the return on the market as a whole. Pratt et al. * * * [Valuing a Business (3d ed. 1996)] * * * at 166.  Betas of public companies are frequently published, or can be calculated based on price and earnings data.  Because the calculation of beta requires historical pricing data, beta can not be calculated for stock in a closely held corporation. The inability to calculate beta is a significant shortcoming in the use of CAPM to value a closely held corporation; this shortcoming is most accurately resolved by using the betas of comparable public companies. * * *  [Furman v. Commissioner, T.C. Memo. 1998-157; fn. ref. omitted.]

debt. Absent any justification why a hypothetical buyer could obtain a debt rate less than 2 percent above the Government bond rate, we see no reason to accept such a low rate as being appropriate.[20] The selection of what we consider to be an artificially low rate depresses the WACC determination.

The BVS study adopted the CAPM determination as appropriate for determining the weighted cost of capital. BVS discarded a constant growth of earnings analysis that yielded an estimate of 18.8 percent because of its "inherent weakness, as compared to the CAPM methodology". In noting BVS's failure to include or convincingly explain why a small company risk premium should be excluded from its calculation petitioner's expert, K. W. McGraw, testified that an appropriate discount rate would be in the range of "17 and a half percent, at least". Having considered all the evidence before us on this point, we have determined that an appropriate discount rate would be approximately 17 percent rather than the 12 percent used in the BVS report or the 22.24-percent rate used in petitioner's expert report prepared by Willamette Management Associates.[21]

---

[20]The 10.5-percent rate appears to be based on the assumption that a hypothetical buyer would obtain Baa-rated debt financing; however, insufficient justification for this assumption has been provided.

[21]See discussion of the Willamette Management Associates report infra pp. 41-42.

In addition to the adjustment necessary for the discount rate, we are not persuaded that other assumptions made in the BVS cash-flow analysis are warranted. The BVS analysis incorporates an amount, by way of an add-back item, for amortization of intangibles. The report assumes that a purchaser of the 56.7-percent share holding would be allowed to make a section 338 election and, as a consequence, would be able to amortize the franchise agreement under section 1253. There are a variety of reasons we find this assumption unwarranted, the most compelling of which is that a purchaser of 56.7 percent of a company would not make a "qualified stock purchase"[22] as required by section 338, and therefore the postulated election would not be

---

[22] Sec. 338(d)(3) provides:

(3) Qualified stock purchase.--The term "qualified stock purchase" means any transaction or series of transactions in which stock (meeting the requirements of section 1504(a)(2)) of 1 corporation is acquired by another corporation by purchase during the 12-month acquisition period.

Sec. 1504(a)(2) provides:

(2) 80-percent voting and value test.--The ownership of stock of any corporation meets the requirements of this paragraph if it--

(A) possesses at least 80 percent of the total voting power of the stock of such corporation, and

(B) has a value equal to at least 80 percent of the total value of the stock of such corporation.

available.  As a consequence, the amount added back into the cash-flows for amortization must be subtracted from the calculation.

We find that an additional adjustment is warranted in the determination of the value of the nonoperating assets that are added to the value of the operating business to achieve the value of PCAB.  The BVS report adds back, inter alia, the following assets:  Cash over $100,000 having a fair market value of $366,774 and deferred charges having a fair market value of $243,031.  We find no basis for this treatment.

The cash in excess of $100,000 held by PCAB and the deferred charges are, in our opinion, operating assets.  The balance sheets for the 3 years preceding the valuation date all show cash on hand substantially in excess of $100,000.  Mr. Robert Shircliff, a witness with considerable experience with Pepsi-Cola bottlers, testified that the rule of thumb for bottling plants is that they need working capital of 40 cents per case sold.  Mr. Richard Lawrence, a vice president of Pepsi-Cola Co., also testified that as a general rule Pepsi-Cola bottlers required working capital of 40 cents per case.  In 1986, PCAB sold 1,884,051 cases.  Using this rule of thumb, PCAB would require

working capital of $753,620,[23] well in excess of the $665,815 shown on the 1986 balance sheet.

BVS determined from PCAB's records that PCAB held notes from Nikita Maggos in the approximate amount of $1,328,110.[24]  A hypothetical purchaser of 56.7 percent of the shares of PCAB from a hypothetical seller would have relied on PCAB's financial statements to determine PCAB's assets.  Neither a hypothetical purchaser nor a seller would have any reason to cause PCAB to discharge Nikita Maggos' debt.  A hypothetical purchaser of 56.7 percent of the shares of PCAB would have been in control and would have logically insisted on repayment of Nikita Maggos' notes.  In the instant case, we think the appropriate treatment of the shareholder notes, for valuation purposes, is to treat them consistently with the business records of PCAB as nonoperating assets.

BVS' discounted cash-flow analysis, after making the adjustments detailed above, would result in a value for 100

---

[23]"Working capital" in this context is defined as the sum of cash on hand, receivables, inventory, and other current assets less accounts payable and other current liabilities.

[24]This number is derived by averaging the notes outstanding on Oct. 31, 1986 ($1,054,138), and the notes outstanding on Oct. 31, 1987 ($1,602,082).  The "Current Market Indicator Evaluation", which was prepared by Shircliff contemporaneously with the redemption transaction, shows notes receivable from stockholders as being approximately $1,300,000.  We note that Coopers & Lybrand, petitioner's expert in the District Court litigation, valued the notes at $1,054,138 in its report.

percent of PCAB of approximately $8,600,000 and result in a value for a 56.7-percent interest of approximately $4,900,000.

<u>Guideline Company Analysis and Market Transaction Analysis</u>

BVS performed a guideline company analysis and concluded "that the fair market value of the common stock in PCAB, as of May 1, 1987, on a minority interest basis, can be reasonably represented as:  $14,536,000".  Two of the companies selected, Pepsi-Cola, Inc., and Coca-Cola Co., are so dissimilar in both size and operations[25] to PCAB that we doubt the comparisons are meaningful.  The other two guideline companies were also significantly larger, having market capitalizations of $518.3 million and $4.2 billion.  In addition to the large discrepancy in size, we are not persuaded that the remaining guideline companies' bottling operations are similar to PCAB's operations which involve a very high percentage, approximately 75 percent, of resale of product bottled elsewhere.  For these reasons, we do not accept BVS' guideline company analysis as reflecting the market value of PCAB shares.

BVS also performed a market transaction analysis that isolated financial data from 16 acquisitions of bottling companies ranging in size from $14.9 million to $1.4 billion in market capital.  The report gives no indication whether any of

---

[25]Richard Lawrence, a vice president of Pepsi-Cola Co., testified that Pepsi-Cola, Inc., and Coca-Cola Co. were in a "different business" than PCAB.

the companies used for comparison had operating characteristics like PCAB's. PCAB's operations involved the sale of a very high percentage of product bottled elsewhere. We are not convinced that this is typical of other bottlers. Consequently, we find the market transaction analysis to be unpersuasive.

Acquisition Analysis

BVS reviewed the sale of PCAB 2 years subsequent to the valuation date to provide evidence of value. The 1989 sale price for 100 percent of PCAB was $13,900,000. This price is the unadjusted base price called for in the contract for sale. Petitioner argues that a more appropriate amount would be $12,436,085, which is the amount specified in a subsequent closing agreement between Nikita Maggos and respondent as the price obtained for the stock. The BVS report states that due to the period of time between the valuation date and the 1989 sale "we placed no weight on this analysis, but present the information to provide additional information by which to evaluate the accuracy of our conclusions."

Petitioner's Expert

Petitioner employed the services of Corporate Financial Consultants (CFC). CFC also valued 567 shares of the common stock of PCAB as of May 1, 1987. Mr. Kenneth McGraw, a principal of CFC, is the author of the CFC report and testified at trial.

Mr. McGraw holds a degree in chemistry from Johns Hopkins University and an M.B.A. from Harvard.

The CFC report concluded that the fair market value of 56.7 percent of PCAB's stock as of May 1, 1987, was $2,691,458. This conclusion is based on the whole enterprise value of PCAB being $6,329,120 and applying a discount of 25 percent for lack of marketability of the 56.7-percent block of stock being valued. CFC used a capitalization of cash-flows as the primary valuation measure.

CFC also performed a reasonableness test using a guideline (comparative) company approach. Their report states: "This approach, however, was not used as a primary measure due to the fact that there were no public companies comparable enough to use as reliable indicators of value for a small, atypical Pepsi bottler like PCAB." CFC also did not use a discounted cash-flow approach "because of difficulties in forecasting future revenues and earnings, given significant changes in margins and earnings in the years preceding the Valuation Date."

CFC also rejected the use of multiples based on the then-current sales of other franchises or dollar-per-case valuations. CFC cited PCAB's small size and heavy reliance on purchasing products from other suppliers (about 75 percent of sales) as reasons to consider PCAB as atypical from other bottlers.

In calculating the value of the operating business, CFC found the compensation paid to Nikita Maggos to be reasonable and therefore made no adjustment to the company's cash-flows in that regard.  Respondent's expert noted that a new owner of 56.7 percent of PCAB would be entitled to review and set the compensation of the executives.  We agree with that proposition.  Respondent's expert estimated that an appropriate level of compensation for the position held by Nikita Maggos would be in the vicinity of $100,000 per year.[26]  Based on PCAB's size, revenue, profits, and dividend history, we agree that this amount is more reasonable than Nikita Maggos' salary of over $250,000.  A majority owner of PCAB stock, other than Nikita's mother, would not likely approve of Nikita's salary level.  As a consequence, we have adjusted the cash-flow in CFC's calculation to account for this fact.

Additionally, we have adjusted the CFC's calculation of the value of the nonoperating assets in the same manner as was done in the discounted cash-flow analysis of respondent's expert and for the same reasons.  The result of the adjustments yields a value for 100 percent of PCAB of approximately $8,600,000 and of $4,900,000 for 56.7 percent.

---

[26]Petitioner's amended complaint in the District Court litigation alleged that Nikita Maggos, an officer and director of PCAB, caused PCAB to pay to him a salary which was excessive and not reasonable.

Value of 56.7 Percent of PCAB Shares (Aggregated Minority

Basis)[27]

After making the appropriate adjustments, detailed above,

BVS' discounted cash-flow analysis and CFC's capitalization of

cash-flows analysis produce a very narrow range of values.  As

stated above, the value of 100 percent of PCAB is approximately

$8,600,000.  The corresponding value for a 56.7-percent interest

is approximately $4,900,000.  We therefore find $4,900,000 to be

the best estimation of the value of 56.7 percent on an aggregated

minority basis.

Our conclusion is also generally supported by more

contemporaneous evaluations that were made by Robert Shircliff.

On brief petitioner states:

> Between 1983 and 1989, there were three occasions on
> which the parties retained neither by Petitioner nor
> Respondent attempted to place a value on PCAB: the 1983
> Shircliff Report; the Worksheet prepared by Shircliff
> in 1987; and Pepsi-Metro's 1989 purchase of 100% of the
> stock of PCAB.  Unlike the various valuation experts
> retained by parties for litigation purposes for this
> preceding and the District Court Litigation, the person
> performing these valuations had no advocacy role.  Each
> had every reason to get the number right.

The 1983 Shircliff report valued the operating business at

$6,438,000.  Petitioner's expert calculated an adjustment to the

1983 Shircliff report "to reflect growth in net sales between

---

[27]We use the term "aggregated minority basis" to mean the
value of the company as a whole multiplied by the relevant
percentage of ownership.

1982 and 1986".[28]  Assuming that growth rate (28.2 percent), the value of the operating business would be approximately $8,250,000.  Using the same figure for nonoperating assets as used to adjust the DCF and capitalization of cash-flows analysis above results in a total value of approximately $11 million and $6.2 million for a 56.7-percent interest.

Illiquidity Discount (Marketability Discount)

A discount may be appropriate to reflect illiquidity or costs of marketing involved in the disposition of an interest in a small closely held private company.  See, e.g., Estate of Simplot v. Commissioner, 112 T.C. 130 (1999); Estate of Mellinger v. Commissioner, 112 T.C. 26 (1999); Davis v. Commissioner, 110 T.C. 530 (1998); Estate of Jung v. Commissioner, T.C. Memo. 1990-5.  The parties' experts disagree about the appropriateness of the application of a discount to the aggregate minority value of the 56.7-percent block being valued.  Respondent again relies on the testimony of Robert Fuller and the report prepared by BVS.  BVS, in its original report and in a supplemental report, concludes that no discount for marketability or illiquidity is appropriate.  Petitioner relies, in part, on CFC's analysis, which concludes that a 25-percent "marketability discount" would be appropriate.  Petitioner also relies on a report prepared by

[28]Petitioner's expert opines that growth rate utilized probably overstates the value of PCAB's operating business in 1987.

Willamette Management Associates (Willamette) and the testimony of Robert F. Reilly, the managing director of that firm.[29]  The Willamette report concludes that a 30-percent "illiquidity discount" would be appropriate.

We found the testimony of Mr. Reilly and Mr. McGraw to be persuasive with respect to the propriety of an illiquidity discount and their reports in this matter to be well reasoned. The facts that PCAB was a small family company and the shares in the company could not be sold without the approval of Pepsi-Cola, Inc., favor the conclusion that some discount is appropriate.[30] After carefully considering all the relevant evidence, including the expert reports and testimony, we consider an illiquidity discount of 25 percent to be appropriate.

Control Premium

As a general proposition, control is an element to be taken into account for purposes of determining the fair market value of corporate stock, over and above the value that is attributable to

---

[29]Mr. Reilly, among his other qualifications, has an M.B.A. degree in finance from Columbia University Graduate School of Business.  He is an accredited senior appraiser as designated by the American Socy. of Appraisers, a Chartered Financial Analyst, a C.P.A., and he has coauthored a book entitled "Valuing a Business".

[30]A lack of marketability discount was applied in a similar circumstance in Estate of Oman v. Commissioner, T.C. Memo. 1987-71 (noting that it would be difficult to sell 75.6 percent of the stock in a family company to an outsider, particularly with decedent's sons remaining active in the business, which justified the application of a marketability discount).

the corporation's underlying assets using traditional valuation methodologies. See Philip Morris, Inc. & Consol. Sub. v. Commissioner, 96 T.C. 606, 628 (1991), affd. 970 F.2d 897 (2d Cir. 1992). The sale of a 56.7-percent block of shares in PCAB would deliver effective operational control to a purchaser and would need to be considered as one of the factors affecting value. See Estate of Chenoweth v. Commissioner, 88 T.C. 1577 (1987). While 56.7 percent of the shares would not command total control of PCAB, it would give the purchaser operational control. In other cases, we have found a control premium should be applied in these circumstances. See also id.; Estate of Feldmar v. Commissioner, T.C. Memo. 1988-429; Estate of Oman v. Commissioner, T.C. Memo. 1987-71. As we stated in Estate of Salsbury v. Commissioner, T.C. Memo. 1975-333:

> The payment of a premium for control is based on the principle that the per share value of minority interests is less than the per share value of a controlling interest. A premium for control is generally expressed as the percentage by which the amount paid for a controlling block of shares exceeds the amount which would have otherwise been paid for the shares if sold as minority interests * * * [Citation omitted.]

Petitioner's expert, Mr. Reilly, opined that the proper control transfer premium was in the range from 34 to 38 percent. Mr. Reilly's report indicates he formed his opinion by calculating the average control price premium paid in the beverage industry over the years from 1982 to 1986. Mr. Reilly

finds the "average control price premium was 35.84 percent".  In his report, Mr. Reilly then argues that the minority shareholder would have to consent to any sale, and therefore the control premium should be turned into a discount because the majority shareholder would need to pay the minority shareholder to get that consent.  We find this reasoning unsupported by authority and unpersuasive, especially in light of the fact that we factored potential problems with the minority shareholder into our determination of an appropriate illiquidity discount.

The transfer of 56.7 percent of the shares would allow day-to-day control to the purchaser.  Considering the level of control transferred, we find that a control premium of 25 percent, rather than 34 to 38 percent that petitioner's expert calculated, would be more appropriate.

The application of both a lack of marketability or illiquidity discount and a control premium has been found to be appropriate in other cases.  See, e.g., Hutchens Non-Marital Trust v. Commissioner, T.C. Memo. 1993-600 (10 percent marketability discount and 35 percent control premium); Estate of Oman v. Commissioner, supra (20 percent marketability discount and 20 percent control premium).  The application of the control premium and the marketability discount is offsetting in this case.

Property Received

In return for her 567 shares of PCAB, decedent received a $3 million promissory note from PCAB. Respondent determined that the promissory note had a value of $3 million. The value of the promissory note is uncontested.

Conclusion

Pursuant to the stock redemption on May 1, 1987, decedent transferred 567 shares of PCAB stock having a fair market value of $4.9 million and received property worth $3 million. As a result of this redemption, Nikita Maggos became the sole shareholder of PCAB. The value received by Nikita Maggos as a result of the redemption of 567 PCAB shares on May 1, 1987, was $1.9 million. Decedent made a taxable gift of $1.9 million to her son Nikita Maggos when PCAB redeemed her interest in the company.

Decision will be entered under Rule 155.